Joseph Mary **EBELING** and Charles G. **Emerling**, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 15582.

United States Court of Appeals Eighth Circuit.

Aug. 28, 1957.

Rehearing Denied Oct. 3, 1957.
Writ of Certiorari Denied Dec. 16, 1957.
See 78 S.Ct. 334.

Michael J. Ebeling, St. Louis, Mo., for appellant Joseph Mary Ebeling.

Ted A. Bollinger, Jr., St. Louis, Mo., for appellant Charles G. Emerling.

Forrest Boecker, Asst. U. S. Atty., St. Louis, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., on the brief), for appellee.

Before JOHNSEN, VOGEL and VAN OOSTERHOUT, Circuit Judges.

JOHNSEN, Circuit Judge.

Ebeling and Emerling, the appellants here, were jointly charged, in an indictment of 9 counts, with 8 violations of 18 U.S.C.A. § 1001 and a violation of the conspiracy statute, 18 U.S.C.A. § 371. The indictment ran against them alone. On a trial to a jury, each was convicted on all 9 counts.

Section 1001, in its here material portion, makes guilty of a criminal offense anyone who, "in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully * * * makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry * * *".

Ebeling was manager of a business, operated under the trade name of Manchester Machine Co. Emerling was president of Production Engineering & Manufacturing Co., a manufacturing corporation. Both enterprises had their location in or near the city of St. Louis, Missouri.

Production Engineering obtained a government contract in 1951, to produce mortar conversion kits for the Department of the Army. The contract contained a price redetermination clause, which required the filing of a statement of the costs involved in kits produced. And, under 50 U.S.C.A.Appendix, § 1214, such a defense contract and any subcontract related thereto were automatically subject to a right of renegotiation on the part of the government, both against the prime contractor and against a subcontractor, for "the elimination of excessive profits".

The exact amount of production which had occurred under the contract is not shown by the printed record, except that the bill of particulars filed by the government states that there had been paid to Production Engineering, on billings by it for kits produced, the sum of $602,608.56 and that the Army was claiming the right to have further credited on such billings the sum of $289,979.09, from overpayments made to Production Engineering on some other contracts. What production and billing there may have been beyond this does not appear, nor is the matter, or any of the other facts referred to in this paragraph, of moment here.

In 1952, while the contract was in force, Production Engineering purported to subcontract to Manchester Machine the doing of some machine work on a number of parts for the kit assemblies.

It executed three purchase order forms in favor of Manchester Machine, ostensibly requesting performance by the latter of some code-numbered operations, on 1200 "adapters" at a price of $7776, on 1200 "housings" at a price of $9888, and on 2500 "strikers" at a price of $8050, respectively.

There is nothing to suggest that Manchester Machine ever had submitted any bid for the doing of this work or at the price set out in the purchase orders. The government's evidence showed, and entitled the jury to find, that the whole thing constituted a spurious affair, done for the purpose of defrauding the government; that the assembly-kit parts covered by the purchase orders were never sent out by Production Engineering to Manchester Machine for the doing of such machine work; that Manchester Machine never engaged in doing the work; that Manchester Machine, however, sent invoices to Production Engineering indicating that the work had been done and making charges therefor, in the amount of $20,298.24; and that Production Engineering made payment of these invoices and incorporated the fictitious charges contained therein in the statement of costs which it submitted to the Department of the Army.

Various incidental cover-up activities were also shown to have been engaged in, at the plants of both Production Engineering and Manchester Machine. Thus, the evidence entitled the jury to find that requisitions of material, together with shipping tickets were falsely executed at the Production Engineering plant, in order to make it appear that adapters, housings and strikers had been duly sent out to Manchester Machine; that similarly shipping tickets were falsely executed at the Manchester Machine plant, to make it appear that the finished parts had been sent back to Production Engineering; and, further, that inspection tickets were falsely executed at Production Engineering, to evidence receipt and inspection of the returned finished parts.

The conspiracy count set out the names of a number of employees at Production Engineering, as having joined in the conspiracy, in that they knowingly had helped to carry on some of the cover-up activities, but they were not indicated, since they apparently had only done what they as employees had been directed to do. Ebeling had not been quite so successful in getting cooperation from the employees of Manchester Machine, in the carrying out of his end of the fraudulent scheme. There was testimony showing that he had turned the three false purchase orders issued by Production Engineering over to one of his employees and directed that bills or invoices for charges be issued against the orders, but that the employee had refused to do so, stating that he knew that no such work had been done in the plant and that he did not want to have anything to do with the matter. The employee testified that Ebeling then tried to assure him that it was all right to make out the invoices against Production Engineering; that he had a "deal" with appellant Emerling; and that the employee did not need to be afraid of anything. When the employee still refused, Ebeling went into his private office and engaged in typing out the invoices himself. He also filled out some false shipping tickets, to indicate the return to Production Engineering of the fictitious finished parts.

As to tangible acts on the part of appellant Emerling, there was evidence from which the jury could properly find that it was he who had given the instructions at Production Engineering for the issuance of the specious purchase orders in favor of Manchester Machine and he who had signed the checks for the payment of the specious invoices sent in by appellant Ebeling—with the papers being sent through the routine of the business for inclusion in Production Engineering's statement of costs to the government. Ebeling had admitted to one of the government's investigators that he and Emerling were personal friends of several years standing, having visited in each

other's home and having taken a number of vacation trips together. There was testimony showing that during the period involved Ebeling came to the Production Engineering plant a number of times and always met with Emerling or Emerling's son—the latter being named, but not indicted, as a conspirator, and being used on the trial as a government witness. Such dealings and relations as necessarily underlay the situation were entitled to be found, on the circumstances shown, to have occurred entirely between appellant Ebeling and appellant Emerling directly, or with Emerling's son, when on occasion the father happened not to be present at the plant.

Each of the 8 substantive counts under 18 U.S.C.A. § 1001 related to the making and using of one of the 8 false invoices, by which Production Engineering was billed; on the basis of which Production Engineering issued its checks to Manchester Machine; and for whose amounts a charge was included in the statement of costs filed with the Department of the Army under the requirement of the contract.

As to each invoice, the applicable indictment count in substance alleged that it constituted a false writing within the purview of 18 U.S.C.A. § 1001; that all of its statements were false, fictitious and fraudulent; that both Ebeling and Emerling so knew; that Ebeling had furnished the invoice to Emerling as a charge for purported work done under Production Engineering's government contract; that it was intended by Ebeling and Emerling that the charge therein should be, and it was, included from the invoice as a part of the costs listed in the statement presented by Production Engineering to the Department of the Army under the price redetermination clause of the contract and the government's renegotiation right; and that Ebeling and Emerling thus had made and used a false writing, knowing it to contain false, fictitious and fraudulent statements and entries, "in a matter within the jurisdiction of the Department of the Army, Ordnance, a Department and Agency of the United States", and so had violated 18 U.S.C.A. § 1001.

The conspiracy count alleged in substance that Ebeling and Emerling had conspired together (in which conspiracy certain named, but unindicted, employees of Production Engineering, and other persons whose names were declared to be to the grand jury unknown, had joined) to defraud the United States, by preparing, keeping and presenting false records and accounts of the costs of Production Engineering in performing its government contract, and particularly the costs of purported subcontracts on the part of Manchester Machine, to the end that Production Engineering's costs under the contract would be wrongfully increased.

In greater fullness, count 9 charged that Ebeling and Emerling, in conspiracy and confederation, had entered into an agreement or understanding, to cause purchase orders to be executed on Production Engineering's forms, to falsely indicate allotments of subcontract work by Production Engineering to Manchester Machine; to cause material requisitions to be executed, to falsely indicate the furnishing of mortar-kit parts to Manchester Machine for the performing of such work; to cause shipping tickets to be executed, to falsely indicate that mortar-kit parts had been sent to Manchester Machine for purposes of such subcontract work; to cause inspection tickets to be prepared, to falsely indicate that finished parts from Manchester Machine had been returned to and checked by Production Engineering; and to cause false invoices to be prepared, making wrongful charges against Production Engineering for such purported subcontract work—which invoice charges Production Engineering was to include in its contract costs. Nineteen specific overt acts, in furtherance or accomplishment of the object of the conspiracy generally were set out, but it is not necessary to detail or discuss these here.

█ The principal contention urged for reversal is that, neither on the charges made nor on the facts proved

as to counts 1 to 8, was it possible for appellants to be guilty of a violation of 18 U.S.C.A. § 1001, because it was not claimed or shown that the invoices themselves were presented to the Department of the Army. It is argued that a writing or document cannot be regarded as being within the jurisdiction of a department or agency of the United States, unless it has been physically presented to such department or agency for consideration, action or reliance, and that only on this basis can a crime exist under § 1001.

We do not believe that the term "jurisdiction", as related to the making or using of a false writing or document, is employed in this technical or limitative sense in the statute involved. Other courts have had occasion to consider the question and have held that § 1001 does not require that a false statement or document must itself have been presented to a department or agency of the United States but that it contemplates as well any knowing making or using of such a statement or document in intended relationship to a matter that is within the jurisdiction of the department or agency. See e. g. United States v. Myers, D.C.Cal., 131 F.Supp. 525, 530; United States v. Giarraputo, D.C.N.Y., 140 F. Supp. 831, 834.

We agree. In more explicit terms, we are of the opinion that it constitutes a violation of § 1001, for anyone willfully to make or use a false writing or document, knowing that it contains a false, fictitious or fraudulent statement or entry, and intending that it shall bear a relation or purpose as to some matter which is within the jurisdiction of a department or agency of the United States, and with the false, fictitious or fraudulent statement or entry which it contains having a materiality on the department or agency matter. If the false writing or document constitutes a legally required record under a statute in some regulatory field, there may perhaps be an even broader liability under the section, but that aspect is not here involved and calls for no consideration.

United States v. Mellon, 2 Cir., 96 F.2d 462, Terry v. United States, 8 Cir., 131 F.2d 40, and Lowe v. United States, 5 Cir., 141 F.2d 1005, illustrate the application of the condition of intended relationship.

In the Mellon case, the defendant had applied to a local bank for a loan insured under the provisions of the National Housing Act, 12 U.S.C.A. § 1701 et seq., and had made some willfully false and material statements in the application executed by him. He was indicted and convicted under 18 U.S.C.A. § 80, of which § 1001 is the counterpart in the 1948 code revision. He contended, among other things, that no violation of the statute could exist, because the false statements had been made only to the bank and not to a government department or agency. The court, in affirming the conviction, said that "The statements were in fact made to obtain a loan insured under the National Housing Act", and that "The application for such a loan was itself a matter within the jurisdiction of an agency of the United States". 96 F.2d at page 463.

In the Terry case, the court regarded the evidence in the particular situation presented as not sufficiently showing that the defendant, in making application to a local bank for a loan, was seeking to obtain one under the National Housing Act, or that the bank at the time could be said to have intended the loan to be of that nature, or that, if it did, it made known to the defendant that the dealings between them were upon that basis. Thus, the effect of the decision was that the evidence as appearing in the record did not establish a situation of intention that the false application should have relation to a matter within the jurisdiction of a department or agency of the United States. The opinion, however, must be read, we think, as implying that, if the evidence had been sufficient to show that "the statements were in fact made to obtain a loan insured under the National Housing Act", as in the Mellon case, supra, that conviction would not have been reversed.

In the Lowe case, the conviction of an employee was reversed, under a charge that he had violated 18 U.S.C.A. § 80 by making a false statement to his employer, a private corporation, as to the number of hours that he had worked on a particular day—the corporation being at the time engaged in building ships for the United States Maritime Commission, an agency of the United States, under a contract calling for the employer to make payment to his employees of their wages but to have reimbursement made to it therefor by the Treasury of the United States.

The court regarded the mere circumstance that the employer was entitled to reimbursement from the United States as not of itself being sufficient to require that the employee's receipt of his wages and his statements in relation thereto be regarded as a matter that was within the jurisdiction of a department or agency of the United States. It said that the obligation for reimbursement "did not effect any change in the relationship existing between the company and * * * private employee", and that, "Insofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any government agency of any kind". 141 F.2d at page 1006.

We read the opinion as implying that there was in that case no charge, or anything to show, that the employee knew that the work which he was doing, and the wages which he claimed, had been made the subject of an express contract provision between his employer and the government, constituting them a matter of direct charge and reimbursing obligation on the part of the United States; that the working time which he turned in thus necessarily would be a matter which was to be used against the government and as to which it accordingly had a right of audit and adjustment; and that in making the false statement with which he was charged, he had turned it in on this basis and with the intent that it was to be accepted and used in that relationship.

■ On the language and purpose of § 1001, we are unable to see any legal reason why an employee would not be guilty of an offense under the statute, if his work consisted in performing tasks under a defense, cost-plus contract between his employer and the government; if he had knowledge of the existence of the contract and of the fact that the work which he was doing was in performance of it; if he knew that the wages paid him were to be reimbursed as such to his employer by the government; and if he willfully engaged in turning in a false, written statement of the hours worked by him, for the purpose of receiving wages not due him, and with the accompanying intent in these circumstances that the statement was to be accepted and used as a basis for the obtaining of reimbursement by his employer from the government, under the statutory power in a department or agency thereof to examine the legitimacy and correctness of the charges involved and with the right to rely upon the employee's statement as a component in the matter.

We can accordingly see nothing legally in the Terry and Lowe cases that helps appellants here, as they seem to believe. But beyond this, the factual situation in the present case is in any event not akin to those in the Terry and Lowe cases. Here, the matter of personal intent on the part of both Ebeling and Emerling to have the statements in the false invoices, which they had designed to have prepared, bear a relation to, by becoming a part of, the fraudulent cost statement which Emerling was to submit to the government, under the price redetermination clause of the contract and under the government's statutory renegotiation right, is not one of probative weakness, such as in the Terry and Lowe cases.

Further, the charges made under the purported subcontracts in favor of Manchester Machine were here directly linked

to the statement of costs filed on behalf of Production Engineering, by 50 U.S.C.A.Appendix, § 1214, in that under the statute the prices paid to a subcontractor were themselves made subject to examination and renegotiation as against the subcontractor himself. As matter of fact, the purchase orders which appellants engaged in using had stamped on their face, "This contract is subject to the Renegotiation Act of 1951 [50 U.S.C.A.Appendix, § 1211 et seq.] and is deemed to contain all provisions of Section 104 of that Act". Hence, the invoices which appellants caused to be prepared, as representing charges made for subcontract work, would of themselves be, on the language of 18 U.S.C.A. § 1001, "in any matter within the jurisdiction of any department or agency of the United States".

■ Each appellant has made some separate, technical arguments as to the insufficiency of the indictment and the evidence to sustain a conviction against him, both on the substantive counts and on the conspiracy count. Our reading of the record shows no merit in any of these contentions. They are of scattered-shot calibre and import only and call for no formal discussion.

The facts and circumstances shown by the record, and the inferences which reasonably could be drawn therefrom, amply entitled the jury to find that Ebeling and Emerling, in their personal friendship, had seized the opportunity, and come to an agreement or understanding, to use Production Engineering's mortar-kit contract to allow Manchester Machine to make charges and receive payments for fictitious subcontract work, and to cast the burden of these fraudulent charges and payments upon the government; that they were to, and did, carry out their fraudulent scheme by causing Production Engineering to issue spurious purchase orders to Manchester Machine and having various cover-up incidents, such as the issuing of false shipping tickets, etc., done at the two plants; that one of the things which they intended, and which Ebeling did on be-

half of both of them, was the drawing up and submitting to Production Engineering of fictitious invoices or bills from Manchester Machine, for inclusion in the statement of production costs transmitted to the Department of the Army for pricing and payment purposes; that they thus both had engaged in a conspiracy to defraud the United States; and that, in having together knowingly caused the several false invoices to be made and used, with the object of having the fictitious invoice work-charges carried into and made a part of the statement of production costs to be submitted for the government's consideration, they both also had been guilty of the several substantive offenses charged against them, of knowingly and willfully making and using a false writing or document, knowing it to contain a false, fictitious or fraudulent statement, and intending it to have a relationship or purpose in a matter within the jurisdiction of a department or agency of the United States.

■ In their joint scheme and intent to have the invoices made, they both were in law chargeable with a making of the writings, which they had so caused to be drawn up. And they both also had engaged in the alternate element of offense under the statute, of using the writings. The indictment charged them with a single offense, in having both made and used the writings. The evidence entitled the jury to find them guilty of having done both of these acts. The sufficiency of the evidence to sustain either of these elements or aspects of offense under § 1001 would, however, legally leave their conviction subject to affirmance.

■ The contention is made that the court erred in receiving in evidence a sample of an adapter, a striker, a housing and an assembled kit, because the exhibits were not in the same condition as they would have been as raw parts, in relation to the time when the crime was alleged to have been committed. The physical objects, however, were not offered as having constituted instrumentalities in the commission of the crime, and

the proof-of-same-condition rule upon which appellants rely, 2 Wharton Criminal Evidence, 11th ed., § 757, therefore has no application.

The trial court could properly receive the exhibits, to enable the jury to understand what the terms "adapter", "striker", "housing" and "motar converson kit", as used in some of the documents and testimony before it, had reference to, 3 Wigmore on Evidence, 3rd ed., § 790. And the court had the discretion further to allow the objects to be used demonstratively, by an exhibiting of them to the employees of Manchester Machine and Production Engineering, whom the government called as witnesses, in connection with their testimony that no such machining of parts, as had been charged for in the invoices, had ever been done at the Manchester Machine plant. This demonstrative use could, of course, beyond the matter of their negative identification by the witnesses, also cause the objects themselves to serve as circumstantial, corroborative evidence of the fact that the invoices constituted false writings.

We can see no force, on the record before us, in appellants' argument that, because the exhibits consisted of finished parts, upon which all the machining work had been done, they were not competent as a basis for the witnesses to make a negative identification, or for use otherwise as circumstantial evidence, in relation to whether Manchester Machine had done some intermediate work, in that it might have been possible that the witnesses could not identify the unfinished parts in their finally completed state. But, in any event, that question was controllingly one for the discretion of the trial court, since the evidence was not within any legal rule of absolute exclusion. Much discretion as to the admitting of circumstantial evidence, especially where fraud is involved, must be allowed the trial court, "and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact". Clune v. United States, 159 U.S. 590, 592, 593, 16 S.Ct. 125, 126, 40 L.Ed. 269; Harper v. United States, 8 Cir., 143 F.2d 795, 803.

█ █ Appellants' contention that the government was improperly allowed to impeach the testimony of one of its own witnesses is without any merit. The same is true of the contention of appellant Emerling that it was error to allow the use against him of the testimony of the employee of Manchester Machine, who had refused to prepare the false invoices for Ebeling, that Ebeling had stated that he and Emerling had a "deal" as to the making of the invoices. Establishedly, declarations of one member of a conspiracy, or of one of the joint members of some other unlawful undertaking, are admissible against members not present, where the declarations have been made for the purpose of furthering in any way the conspiracy or undertaking. 4 Wigmore on Evidence, 3rd ed., §§ 1079 and 1077; Lutwak v. United States, 344 U.S. 604, 617–618, 73 S.Ct. 481, 489, 97 L.Ed. 593; Cwach v. United States, 8 Cir., 212 F.2d 520, 525; Lennon v. United States, 8 Cir., 20 F.2d 490, 494. Here, appellant Ebeling made the declaration in question for the purpose of inducing the Manchester Machine employee to go ahead and prepare the fraudulent invoices, as something that both he and Emerling desired to have done and that represented one of the steps to be taken in the fraudulent scheme. This was, of course, only an added element in the government's substantial proof of Emerling's participation, which has been set out above.

█ Appellants' final contention is that the court's instructions were erroneous, because they required the jury to return a joint verdict only, of guilt or innocence, on each of the 8 substantive counts, and thus deprived them of the benefit of the provision of Rule 31(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., that "If there are two or more defendants, the jury at any time during its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed  *  *  *".

438

The court's charge called the jury's attention to the fact that the substantive counts had charged that appellants jointly had done the acts involved and stated that it therefore was not sufficient as a basis for a conviction against them that one of them may have known that the invoice involved was a false writing, but that the jury had to find, before it could convict, that "the knowledge of falsity and intent as to use in a matter within the jurisdiction of the Department of the Army, Ordnance, be known and intended by both defendants".

The court went on to emphasize, however, that there could be no conviction of both of them on the knowledge or intent simply of one of them alone, but that "you must find the defendants each knowingly and intentionally caused the invoices referred to * * * to be made, and thereafter * * * knowingly and intentionally caused the invoice to be used as an item of cost in executing the prime contract * * * with knowledge of its falsity, and knowingly and intentionally caused the invoice to be used as a sum going to make up the total sum presented to the Army * * * and that they intended and knew it was included in the figures presented to the government's agent * * *".

This, in its effect, required the jury to find that each one of them individually was guilty of all the elements of the crime, before there was a right to convict, but on the basis of the other instruction prohibited the returning of any verdict whatever of conviction, even though one of them might have been proved to be so guilty, unless the jury found that the other also had been proved to be so guilty. In other words, while neither defendant, of course, could be convicted on the other's guilt, each was given the advantage by the instructions of being made subject to acquittal on the other's innocence.

The according of this improper benefit, in opportunity for acquittal, could hardly be claimed by either appellant to be a prejudicial error against him. Error favorable to an appellant does not constitute a basis for reversal in a criminal case. Stevens v. United States, 6 Cir., 206 F.2d 64, 66; Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.

Appellants have been convicted of proper indictment charges, on a fair trial, under process which is free from prejudicial error, and with a result that the record persuades is just. There is no basis for either of them to ask for reversal.

Affirmed.