**UNITED STATES of America**
v.
**COASTAL CONTRACTING AND ENGI-
NEERING COMPANY, Inc.,**
and
**Murray B. Silverman.**
Cr. No. 24675.

United States District Court
D. Maryland.

July 2, 1959.

Leon H. A. Pierson, U. S. Atty., John R. Hargrove and R. Taylor McLean, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Walter C. Herlihy and S. Herbert Harris, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

The government is pressing the second and third counts of a three-count indictment charging Coastal Contracting and Engineering Company and its president, Murray B. Silverman, with violations of 18 U.S.C.A. § 1001, in connection with documents submitted in support of the estimated cost of work done or to be done under proposed changes to a construction contract. 18 U.S.C.A. § 1001 reads as follows:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations,

or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. * * *"

The case was tried before the court without a jury.

## Findings of Fact

Coastal entered into a contract with the Department of the Navy, Bureau of Yards and Docks, dated 26 June 1957, for the construction of a transmitter building for a reflector at the United States Naval Radio Station, Annapolis, Maryland, at a cost of $244,350. The contract contained customary provisions for Changes and Disputes, set out in the margin.[1]

J. A. Coddington, Capt., CEC, USN, was the Officer in Charge of Construction, with authority to sign the change orders involved in this case. In accordance with customary procedures, P. A. Petzrick, Lt. J.G., CEC, USN, the officer who supervised the administration of the contract after the middle of November 1957, conducted negotiations with the contractor so that he could recommend to the Officer in Charge of the Construction what would be a fair and equitable price for the changes.

## Second Count

The original contract called for a concrete slab in which were imbedded copper conduits [2] which curved from a pipe-trench into the transformer room and through a masonry wall. The radius of the curve was changed twice after the conduits were put in place, requiring "bends" which are not items of standard manufacture. It was necessary for Coastal to purchase lengths of straight pipe and have them bent to order either by the suppliers or by subcontractors.

---

**1.** General Provisions 3 and 6:
"Changes
"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed."
"Disputes
"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: *Provided,* That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

**2.** Sometimes called conducts.

This required some travel by Coastal's employees and considerable wastage of pipe.

The government had advised Coastal of the proposed copper conduit change in September 1957. The supplies were purchased and the work done in October, and on November 15, 1957, Coastal requested an extra payment of $3,264.55 for this change. When Lt. Petzrick took over the administration of the contract late in November, he felt that Coastal's request was too high; he arranged a conference with Ewell, Coastal's superintendent, early in December, at which he requested that Coastal submit another "estimate summary for change order" with supporting figures. In response to this request, Coastal submitted an estimate summary, dated March 4, 1958, signed by Murray B. Silverman, president. Attached to the estimate summary was a paper on Coastal stationery headed "Cost Breakdown", on which Coastal's travel and direct labor expenses totaling $537.40 were itemized, and three other items were listed, as follows: "Materials from Nicholson Engineering Company $2,291.04. Subcontractors: Nash Welding $215.00; Doane & Lewis Lubricators $417.00." Also attached to the estimate summary was what purported to be a letter from Nicholson Engineering Company on that company's stationery, signed "M. Beck", addressed to Coastal, stating: "In response to your request for a breakdown of costs for copper conduit which we supplied to you in various sizes on subject job, we are submitting herewith the following breakdown: * * *". Then followed a list of items totaling $1,909.20, to which was added "Contractor's handling charges— 17%—$381.84", making a grand total of $2,291.04.

The letter was not authorized in any way by the Nicholson Engineering Company. No such person as "M. Beck" had any connection with that company. The fictitious name was signed to the letter by defendant Silverman or at his direction.[3]

Only $466.61 of the items listed in the "M. Beck" letter had been actually sold by Nicholson to Coastal.[4] Several other items in the letter represented materials purchased by Coastal for cash. Some of the items were false and fictitious altogether,[5] some were included at inflated amounts.[6] The item "Contractor's handling charges—17%—$381.84" was entirely false, since no such charge was contracted for, billed or paid.

The false letter, containing the false and fictitious statements and representations, was submitted by Silverman on behalf of Coastal knowingly and wilfully on a material matter within the jurisdiction of the Navy Department, namely, the

---

3. Some of the Nicholson stationery happened to be at Coastal's office because a letter signed by Nicholson in connection with another extra had been typed at Coastal's office and Nicholson had inadvertently left a couple of letterheads at Coastal's office. The draft of the "M. Beck" letter was prepared on a yellow sheet of paper by Ewell. I find that the testimony of Silverman that the draft was brought to him by Nicholson was false. I further find that a yellow sheet of paper which Ewell gave Yingling, Nicholson's representative, did not contain all of the items in the letter.

4. Some of the material used in the changed work was normally sold by suppliers to mechanical contractors, and not to general contractors on the same terms. Coastal therefore had arranged with Nicholson, which had several mechanical contracts with Coastal, for Coastal to buy pipe in the name and for the account of Nicholson, Coastal to pick up the material from the suppliers. Nicholson had agreed to this arrangement as a favor to Coastal; it was understood that Nicholson would pay the supplier's invoices and bill Coastal without any additional charge for overhead or handling. Material costing $505.61 was purchased in this way. Through error Nicholson failed to bill Coastal for $39.00, but $466.61 was billed by Nicholson and paid by Coastal.

5. E. g. one of two $266.40 items.

6. E. g. Atlantic Copper and Brass (for pipe) included at $88.80 when the invoice offered in evidence by defendant was for $77.14.

amount to be allowed Coastal for the change.

On March 5, 1958, a conference was held, attended by Lt. Petzrick and other representatives of the Navy Department and by Silverman and Ewell on behalf of Coastal. As a result of bargaining at that conference, the parties agreed to a settlement, which resulted in the allowance in Change Order C of the net sum of $2,300 for the change in the copper conduit.[7] Lt. Petzrick did not know that the "M. Beck" letter was false and fictitious, and considered that letter in reaching the settlement figure of $2,300, which he recommended to Capt. Coddington, the Officer in Charge of Construction.

For reasons discussed below, the fact that Lt. Petzrick was influenced by that letter is not an essential part of the crime under sec. 1001. The important thing is that Silverman and Coastal submitted the false document, and made the false and fictitious statements contained therein, knowingly, wilfully and deliberately, intending that they should influence the representatives of the Navy Department. The matters dealt with in the letter were material to the matter under discussion, and the misstatements were material.

### Third Count

The original contract called for a ¼ ton capacity chain hoist. In the fall of 1957 the Navy decided to install a 2 ton capacity electric operated hoist and a ½ ton capacity extended hand wheel chain operated hoist with special mounting hooks in lieu of the ¼ ton capacity chain hoist originally specified. The revised drawings for the large hoist were ready on October 30, 1957.

On November 15, 1957, Silverman, on behalf of Coastal, submitted an estimate summary for change order to which were attached a breakdown on Coastal's stationery and what purported to be a letter, dated November 12, 1957, from Standard Distributing Company signed "Andrew Livingston, Sales Department", quoting a price of $4,579.79 for the two hoists and stating: "It may be added that the weather proofing does not meet Radio Interference Suppression Specifications, and in checking we have not yet to find *any* manufacturers who are able to comply with Navy requirements." This letter was false and fictitious in that Andrew Livingston was an infant of tender years, too young to be employed by anyone, and did not sign the letter. Standard Distributing Company is a subsidiary or associated company of Coastal's, and sometimes acted as Coastal's purchasing agent. The principal importance of this letter is that it shows the disposition of Silverman to submit false and fictitious letters, and weighs

---

7. The minutes of the meeting of March 5, 1958, contained the following entry:

"*Copper Conduit*—Lt. Petzrick pointed out to the contractor that upon investigation certain costs submitted were not applicable. Exception was particularly taken to payment requested for wasted material in fabrication. Lt. Petzrick informed contractor that Government could not pay for such material and would pay for only actual materials and labor necessary for bending the copper conduit. It was pointed out that there was a standard bending procedure for copper conduit and that waste due to negligence on suppliers' part was not the Government's responsibility. In reviewing estimate the contractor pointed out that the costs were high due to numerous changes in the radii of the conduit. Mr. Ewell stated he was directed to install the conduit; namely, 4" diameter copper, first with 5" radius bends, cast fittings, second-ly, to remove and reinstall with 12" radius bends, cast fittings, and finally place with 18" radius bent pipe. Mr. Ewell also advised that such changes delayed his work because floor could not be poured until the radius of these bends was finally established. Also, Mr. Ewell indicated that additional travel expense was incurred in an effort to expedite the work due to these changes. Further discussion of this change resulted in final agreed costs, which omitted any payment for wasted materials and labor charges, in the amount of $2954.00 for the additional work involved under this change. As this work was a change from original plans, a credit due the Government for original work not accomplished was agreed upon in the amount of $354. The final settled costs therefore considered fair and reasonable by all parties was $2300.00."

against the credibility of his contention that the other false and fictitious letters were authorized by representatives of the companies whose letters they purported to be.

After further negotiations, the Navy Department dropped the requirement that the large hoist contain a radio interference suppressor. Meanwhile, Ewell had spent some time traveling to find a hoist that would suit the Navy. In January 1958 it appeared that a Manning, Maxwell & Moore hoist, sold in Maryland through the Freeland Equipment Company, would meet the specifications, and a representative of the manufacturer and a representative of Freeland met Ewell on January 23 to look over the plans and specifications and prepare an estimate.

On January 23 Freeland sent Coastal a letter signed by Edward J. Schutt, Jr., Freeland's sales and service manager, quoting a price of $3,597 for the large hoist and $320 for the small hoist, a total of $3,917.[8]

On January 28 Coastal sent a letter signed by Silverman, its president, addressed to District Public Works Office, Severn River Naval Command, enclosing an estimate summary for change order on the additional hoists, together with shop drawings submitted by Manning, Maxwell & Moore. The estimate summary included under the heading "Prime Contractor's Direct Material" the sum of $4,936; the accompanying breakdown included "Materials—Two Hoists—$4,936." Lt. Petzrick had made some study of hoist costs and felt this item was entirely out of line. Accordingly, the matter was discussed at the meeting on March 5, 1958. The minutes of that meeting show:

> "*Additional Hoists*—In reviewing submitted costs for this item, Lt. Petzrick pointed out that supplier's

prices for hoists were considered high, there being no back-up included to substantiate those prices. Also the subcontract electrical work involved and prime contractor's direct labor costs were not acceptable. Upon review of entire estimate, it was agreed that a reasonable cost for electrical work· was $50.00; prime contractor's direct labor for additional steel erection, labor and supervision $290.00; the balance, cost of hoists being held in abeyance pending verification of hoist prices from suppliers. Approved hoist drawings were handed contractor at meeting. Letter to confirm same will be written."

On March 10 Coastal, through Silverman, wrote District Public Works Office, Severn River Naval Command, a letter stating: "Enclosed you will find a revised breakdown and a letter from Freeland Company for the two hoists for the above job." The breakdown showed the two hoists at $4,936, but included a credit of $500 for the original hoist which had been eliminated. Silverman also enclosed what purported to be a letter from Freeland Equipment Company, Inc., on its stationery, dated January 23, 1958, which purported to be signed on behalf of Freeland by "Fred K. Strutt, Sales and Service". This letter was generally similar to the bona fide letter of January 23, 1958, except that the price for the large hoist was $4,616 instead of $3,597. Silverman does not deny that he prepared and signed or authorized the signature on the fictitious letter, but says that he was authorized to do so by Freeland's salesman. I find that he was not so authorized, and if he were, it would not prevent his guilt, although it might implicate the salesman. Silverman testified that Coastal had incurred traveling ex-

---

8. Freeland's representative testified that Ewell asked him to add about 50% to the true price of the hoist in the estimate which he submitted. I admitted this evidence against Coastal but not against Silverman. Ewell denied that he had made such a statement and said he had suggested that an additional amount be included to speed delivery. Although I believe that Ewell probably did make some such improper suggestion, I have not considered it in making my findings of fact against either Coastal or Silverman.

penses which the government would not allow as such, and that Lt. Petzrick had suggested to him that it was a common practice for the prime contractor to raise the subcontractor's costs by adding such amounts. I find as a fact that Lt. Petzrick did not make any such statement either to Silverman or to Soldano, another officer of Coastal who gave similar testimony to that given by Silverman on this point.

Lt. Petzrick was still not satisfied, and on March 15, 1958, Silverman, on behalf of Coastal, sent another letter to the Severn River Naval Command enclosing another fictitious letter purporting to come from Freeland Equipment Company, dated March 14, 1958, signed "Fred K. Strutt, Sales and Service". This fictitious letter attempted to justify the price quoted in the previous fictitious letter.

The two Strutt letters were false and fictitious in that they were not authorized by the Freeland Company and the person who purported to sign them was non-existent. The statements contained in the letters, particularly the quoted price for the hoists, were false and fictitious. They were submitted by Silverman to the Navy Department knowingly, wilfully and deliberately, intending that they should influence the representatives of the Navy Department. The facts in the letters were material to the matter under discussion and the misstatements were material.

The negotiations continued, and on April 23, 1958, Silverman wrote the Officer in Charge of Construction, Severn River Naval Command, stating: "We have received a reduction in the price for this work from $4,616.00 to $4,175.00. We feel that this reduction is fair and just and honestly believe that the Freeland Company will make an honest profit." The statements in this letter were false because the Freeland Company had never agreed to any reduction in its price and had never submitted any price as high as $4,175.

Lt. Petzrick did not rely on those letters because from the first he thought the prices were entirely out of line. This, however, does not prevent their submission being a violation of 18 U.S.C.A. § 1001. The important thing is that Silverman and Coastal submitted the false and fictitious documents, and made the false and fictitious statements contained therein, knowingly, wilfully and deliberately, intending that they should influence the representatives of the Navy Department. The matters dealt with in the documents were material to the matter under discussion, and the misstatements were material, calculated to induce reliance and action by the Navy Department.

### Discussion

Defendants contend that the false and fictitious letters and the false and fictitious statements made therein were not material because they did not in fact influence the government. The evidence shows that the "M. Beck" letter, upon which the second count is based, was in fact considered by and did influence Lt. Petzrick in the recommendation which he made. On the other hand, he was always suspicious of the two "Strutt" letters and of Silverman's letter of April 23, 1958. Defendants argue that since those letters did not in fact influence Lt. Petzrick they were not material. In a case where a similar argument was made, United States v. Quirk, D.C.E.D.Pa., 167 F.Supp. 462, Judge Kraft said:

"Defendant urges that no false statement 'could affect or influence' or be 'capable of influencing' if, because of extrinsic circumstances, the ultimate objective of favorable agency action was impossible of attainment. We disagree because we believe that the conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible. We think the test is the intrinsic capabilities of the false statement itself, rather

than the possibility of the actual attainment of its end as measured by collateral circumstances. Freidus v. United States, 1955, 96 U.S.App.D. C. 133, 223 F.2d 598, cited by the defendant, supports this conclusion." 167 F.Supp. at page 464.

Judge Kraft's decision is supported by United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598; United States v. Larocca, 3 Cir., 245 F.2d 196, 199; and United States v. Myers, D.C.N.D. Cal., 131 F.Supp. 525, at 531. 18 U.S.C. A. § 1001, under which the prosecutions in Quirk and in the instant case were brought, is similar to the section of the criminal code involved in Gilliland. See United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594; United States v. Stark, D.C.Md., 131 F.Supp. 190, 200–202. The language of Chief Justice Hughes, speaking for the Court in Gilliland, is in point here:

> "The amendment [of 1934] eliminated the words 'cheating and swindling' and broadened the provision so as to leave no adequate basis for the limited construction which had previously obtained. The statute was made to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents or affidavits 'in any matter within the jurisdiction of any department or agency of the United States.' In this, there was no restriction to cases involving pecuniary or property loss to the government. The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described. We see no reason why this apparent intention should be frustrated by construction." 312 U.S. at page 93, 61 S.Ct. at page 522.

 Defendants further argue that sec. 1001 was not intended to apply to statements made and documents supplied during bargaining, and submit that "all the cases" deal with affidavits and statements required by some statute or regulation. This submission is not true, see e. g. Ebeling v. United States, 8 Cir., 248 F.2d 429, 434; Cohen v. United States, 9 Cir., 201 F.2d 386. The defense confuses offers submitted as moves in a bargaining process with letters and other documents submitted in support of those offers.

 Several false and fictitious documents were knowingly, wilfully and deliberately submitted by defendants to the Navy Department in a matter within its jurisdiction; they contained false and fictitious statements with respect to a material matter, namely, the costs to which Coastal had been subjected as a result of the changes; Silverman knew that the letters and the representations were false and fictitious.

### Conclusion

I am satisfied beyond a reasonable doubt that both Silverman and Coastal are guilty of the crimes of which they are charged in the second and third counts of the indictment.