**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Raymond L. HOOPER,**
**Defendant-Appellant.**

**No. 78–1621.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1979.

Decided April 4, 1979.

Rehearing Denied June 13, 1979.

---

Michael F. Hupy, Milwaukee, Wis., for defendant-appellant.

Negatu Molla, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and EAST, Senior District Judge.*

EAST, Senior District Judge.

Raymond L. Hooper (Hooper) appeals the denial of his post-trial motions and judg-

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

ment of conviction and sentence to custody entered by the District Court on May 3, 1978 following a jury trial for violation of 18 U.S.C. § 1001.[1]

We note jurisdiction under 28 U.S.C. § 1291, and affirm.

*INDICTMENT AND CONVICTIONS:*

Hooper was charged in a nine count indictment. Count 1 charged that Hooper, between July 16, 1974 and December 16, 1974, in violation of § 1001, willfully and knowingly misrepresented the signatures on certain stipend rosters as the signature of Diane Veasley in acknowledgment of the receipt of stipend payments, although Hooper knew that such signatures were false and fraudulent and that such stipends had not been paid to Diane Veasley. The substance of Counts 2 through 9 was identical to that of Count 1 but alleged different dates and false signatures of different persons.

The jury found Hooper guilty of Counts 1, 3 and 8 and not guilty on the remaining six counts.

The District Court sentenced Hooper to 90 days in custody on Count 1 and concurrent 90 days custody on each of Counts 3 and 8.

*FACTS:*

The evidence presented at trial showed that Hooper was the associate director of the Upward Bound Program (UBP) at the University of Wisconsin-Milwaukee (UW–M) and that one of his duties was to supervise stipend payments to students participating in the program. The UBP was created by Congress and administered and funded under the Department of Health, Education and Welfare (HEW). The funds received from HEW were maintained by the University in a separately designated account.

HEW and the controlling federal statutes and regulations set forth the amount and the frequency of stipend payments that were to be paid to students participating in the program. The stipend rosters were prepared and utilized by UW–M to provide internal control over stipend disbursals and to provide an "audit trail" to enable federal program auditors to determine how the federal funds were disbursed.

These stipend rosters were an integral part of the UBP. A list of students in the program eligible to receive stipends for the period was provided to the university cashier every two weeks. The cashier would then disburse ten dollars to Hooper from the Upward Bound account for each name listed. Students were to sign the rosters when they received their stipends. Hooper was to return ten dollars for every named student who had not signed the roster. In this manner, every stipend was accounted for. This stipend roster was thus utilized in drawing upon the Government-funded Upward Bound account.

The testimony showed that even though the stipend rosters were not prepared by HEW, they were part of UW–M's procedure for internal control of the UBP. Such a system of internal controls and accounting was mandated by the HEW Audit Guide. The testimony further showed that Hooper knew of the relationship between the UBP and HEW.

An audit of the UBP for the period when Hooper was in charge of disbursement of funds was conducted and it was concluded that $1,010.00 was unaccounted for. One of Hooper's superiors, Dr. Spaights, required that he pay said amount to UW–M. Neither Spaights nor Hooper's immediate supervisor, Clara New, accused Hooper of theft or intentional misconduct; the request for payment was based on misman-

---

1. Section 1001:

 "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or repre-

 sentations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

agement. Dr. Spaights threatened to fire Hooper if any intentional misconduct on his part were discovered, but he became satisfied that there was none, and Hooper remained employed at UW–M until he accepted another position.

Hooper admitted both in a statement given to the FBI and during trial that he, on occasion, signed the names of students on stipend rosters, but that on each and every occasion he either gave the student his stipend money or reasonably assumed he had received the same.

*POST–TRIAL MOTIONS:*

After trial, Hooper timely filed the following motions:

1. Motion for Judgment of Acquittal (Fed.R.Crim.P. 29, insufficient evidence to sustain the conviction);
2. Motion in Arrest of Judgment (Fed.R. Crim.P. 34, non-compliance with the Speedy Trial Act of 1974);
3. Motion for Judgment of Acquittal or a New Trial (Fed.R.Crim.P. 29 and 33, preindictment and pretrial delay denied due process; exculpatory evidence was withheld by the Government; and perjury of Government witnesses); and
4. Motion for New Trial (Fed.R.Crim.P. 33, accumulated errors by the District Court in receiving evidence of Hooper's voluntary payment of $1,010 to UW–M; implying Hooper's guilt to the jury during the Court's questioning of the appellant; commending a grand jury in the presence of some of the jurors in this case for returning an indictment in another case; improper statements of the U. S. Attorney; withholding of exculpatory evidence; and intentional false testimony of Government witnesses).

On May 3, 1978, the District Court denied each of these motions and entered the judgment of conviction and sentence.

*ISSUES ON REVIEW:*

Hooper asserts seven issues on appeal. We deem the following issues to be dispositive of the appeal:[2]

1. Did the District Court err in denying Hooper's motion for a judgment of acquittal on the grounds that the Government failed to prove that the stipend rosters were within the jurisdiction of the United States or that the alleged false statements were fraudulently made?

2. Did the District Court err in denying Hooper's motion to dismiss, or in the alternative, motion in arrest of the judgment for the Government's alleged failure to try Hooper within the time limit set by the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*?

3. Did preindictment and pretrial delay prejudice Hooper and deny him his constitutional rights?

4. Did the District Court err in denying Hooper's motions for judgment of acquittal or for a new trial for the reason of the Government's alleged failure to provide exculpatory evidence before trial or the alleged perjury of Government witnesses?

5. Did the District Court err in admitting evidence of Hooper's voluntary payment of $1,010 following the audit and request of UW–M?

*DISCUSSION AND DISPOSITION:*

*Issue 1:*

█ Hooper contends that insufficient evidence was adduced at trial to prove the requisite jurisdictional element under 18 U.S.C. § 1001, that the false statement be made "within the jurisdiction of any department or agency of the United States." The thrust of Hooper's argument is that the stipend rosters, upon which the false signatures were affixed, were internal UW–M documents and not presented directly to and relied upon by HEW. We do not agree.

In *United States v. Candella,* 487 F.2d 1223 (2d Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974), the Court held that even though affidavits submitted by movers were executed on forms prepared by the City of New York and not

2. The remaining issues asserted by Hooper are without merit.

by HUD, the affidavits were within the purview of 18 U.S.C. § 1001, where the City had entered into contract with the United States prompting the moving, where the Government was ultimately responsible for paying the moving expenses, and where the movers were aware of that relationship between the Government and the City.

*Candella* also makes clear that 18 U.S.C. § 1001 "does not require that the false statement must actually have been submitted to a department or agency of the United States, but rather that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency." *Id.* at 1227. In *Candella,* as in the instant case, the City was authorized to make payments, without securing express approval from HUD, although the complete files on such claims were to be kept available by the City for audit and inspection by HUD. This case presents an analogous situation in that one of the purposes of the stipend rosters was to provide an "audit trail" for federal program auditors. *See also United States v. Kraude,* 467 F.2d 37 (9th Cir.), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 664 (1972); *United States v. Waters,* 457 F.2d 805 (3d Cir. 1972). In *United States v. Munoz,* 392 F.Supp. 183 (E.D.Mich.1974), *aff'd,* 529 F.2d 526 (6th Cir. 1975), Chief Judge Kaess held that where the United States Department of Labor had authority to regulate the use of funds distributed through a national organization, which was a contractor to the Department of Labor, to a state-chartered non-profit organization which was a subcontractor to the national organization, any false statement submitted to the state-chartered organization was made in a matter within the "jurisdiction of an agency or department of the United States." *Munoz,* at 186, reaffirms not only the proposition that the fraud need not be perpetrated directly on or to the governmental agency involved, but that the term "jurisdiction" in 18 U.S.C. § 1001 should not be given narrow or technical meaning. *See also Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969).

Hooper objects to the instruction given by the Court defining "within the jurisdiction of any department or agency of the United States." The instruction was based on the holding in *Ebeling v. United States,* 248 F.2d 429 (8th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957). *Ebeling* stands for the proposition that § 1001 does not require false statements or documents to be presented directly to a governmental department so long as such statement or document is used in some intended relationship to a matter within the jurisdiction of the department. *Id.* at 434.

In *Ebeling,* where the employer was to be reimbursed by the Government, and where the employee's willful and intentional false statements as to the hours he worked were submitted intending that such "bear a relation or purpose as to some matter which is within the jurisdiction of a department or agency of the United States," the Court concluded that such was "within the jurisdiction of a department or agency of the United States." *Id.*

The instant case is even stronger against the defendant than in *Ebeling* for here Hooper's false statements allowed him to fraudulently remove funds provided directly by HEW. We join in the rationale and holdings in *Candella, Munoz,* and *Ebeling.*

Hooper argues that the evidence is insufficient to prove that he made and/or used false and fraudulent statements. We disagree. Our sole determination on review is whether a rational trier of fact could have found from the evidence, beyond a reasonable doubt, that the defendant was guilty. *United States v. Scher,* 476 F.2d 319 (7th Cir. 1973). In making that determination, we must view the evidence with inferences reasonably and justifiably to be drawn therefrom most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Cardi,* 478 F.2d 1362 (7th Cir.), *cert. denied,* 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973).

Each of the nine students named in the indictment testified that their names had

been forged on the stipend rosters and that they had not received the stipend payments for those dates. The testimony of the Government's expert witness unquestionably proved that Hooper had forged the signatures of those students in Counts 1, 3 and 8. Upon questioning, Hooper admitted the same. The evidence of guilt on Counts 1, 3 and 8 is abundant.

We conclude that the District Court did not err in its denial of Hooper's motion for a judgment of acquittal, as raised in issue 1.

## Issue 2:

The indictment was returned October 25, 1977. The earliest false stipend roster was dated October 27, 1973, and the latest was February 21, 1975 (Count 3). In Counts 1 and 8, the dates were intermediate. Hooper was arraigned on November 1, 1977, and admitted to appearance bond. Hooper's trial was scheduled for February 13, 1978 but, due to court congestion, was rescheduled for and commenced on March 13, 1978.

█ Hooper contends that the rescheduling of his trial was violative of the Speedy Trial Act. The contention is groundless. Congress has not provided for the sanction of dismissal until after July 1, 1979. 18 U.S.C. § 3163(c). The District Court did not err in the context of issue 2.

## Issue 3:

█ Hooper argues that since the Government was made aware of a potential crime and he was not tried thereon for a period of 21 months, he is entitled to be acquitted. The contention of delay has no merit. Unlike the defendant in *Ross v. United States*, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), Hooper was aware of the audit and the claims of UW–M as early as March, 1975. He was aware that the Government was investigating as early as October 7, 1976, when he was questioned by the FBI in Missouri. Therefore, Hooper was not prejudiced by preindictment and pretrial delay.

## Issue 4:

### A. Exculpatory Evidence.

Hooper claims that the Government intentionally kept exculpatory evidence concerning Cynthia Triggs' participation in the UBP during 1974 from his defense counsel before trial and covered up the fact during trial. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The record reveals: The Government called Cynthia Triggs as a witness in connection with Count 8. Triggs testified she was in UBP for a short time in 1973 and terminated her participation before Hooper became associated with the program. Further, she testified that she never knew Hooper. The Government's expert witness testified that the name "Cynthia Triggs" appeared several times on stipend rosters in 1974 and that such signatures were signed by Hooper. In fact, Triggs was attending classes in April, 1974, and was not dropped from the program until June 24, 1974.

Hooper would fault the Government for not eliciting a true statement of facts on direct examination of Triggs.

It appears from the record that shortly after Triggs had testified, counsel for the Government informed the Court that during the noon recess, he had discovered that a signature, not an apparent forgery, was found in the name "Cynthia Triggs" in 1974. Government counsel expressed his concern that Exhibit 14, a composite sheet of Triggs' signatures on various stipend rosters, did not contain that extra signature. Counsel further stated that while no representation had ever been made that every signature on every stipend roster would be on the composite sheet, he felt that in view of the nature of Triggs' testimony, he wanted to avoid any appearance of misrepresentation. The Government counsel then proposed to recall Cynthia Triggs to verify whether or not the extra signature was hers and to examine her concerning the surrounding circumstances to determine if it were her signature. Hooper specifically objected to allowing further testimony by Triggs. The Court sustained Hooper's objection.

It further appears that prior to trial, counsel for the defense was provided full and complete access to the entire investigative file in this matter, and all proposed exhibits. He took advantage of that opportunity on at least two occasions. That file contained FBI Special Agent Hann's report. That document reflects attendance records of Cynthia Triggs in 1974. It is apparent that counsel had not only access to that document, but a photo copy of it as well, for during the trial defense counsel used that document in his cross-examination. The same can be said for the stipend roster discussed with the Court bearing a signature in the name of Cynthia Triggs in 1974.

Triggs was available for cross-examination on those matters and defense counsel, for whatever reason, tactical or otherwise, chose not to examine her on the subject. Furthermore, when mistake or other inadvertence appeared, the Government requested the recall of Triggs for further examination as to her participation in UBP during 1974 and signature on the mentioned stipend roster. The request was denied on *defense's objection*.

 We find no abuse of the *Brady* rule by the Government and conclude that the District Court did not err under this phase of issue 4.

### B. Perjured Testimony.

Hooper contends that Government witnesses Bruenger, Checkvala, and Hann deliberately testified falsely in the following particulars:

Bruenger and Checkvala both testified falsely that they never disbursed stipend money to students and that Hooper was responsible for doing the same. Checkvala also testified that when Hooper would leave his office, Checkvala would not disburse stipend money because that task would be performed by Clara New's secretary. This testimony was completely contradicted by students and other witnesses who testified during the trial. It is further alleged that Special Agent Hann's testimony that he was unsure whether Cynthia Triggs identified a certain document as containing her

signature was an intentionally false statement.

Hooper makes no showing that the witnesses deliberately lied nor that the Government knowingly allowed them to falsely testify.

We are satisfied from our perusal of the record evidence that the testimony of the three mentioned witnesses and that of the various students was indeed contradictory, but that such contradiction was due to their respective recollections on the subject rather than to intentional falsehoods.

 The assessment of witness credibility is to be left to the jury whose function is to reconcile discrepancies in the testimony.

 We conclude that the District Court did not err under this second phase of issue 4.

### Issue 5:

Hooper contends that admission of evidence showing Hooper's repayment of $1,010 to UW–M was prejudicial and should have been excluded as an offer in compromise. While both parties agree that offers to plead guilty in criminal cases and settlement offers in civil cases are not generally admissible as evidence, we decline to view Hooper's repayment of $1,010 under the facts presented to be analogous to that general proscription. Hooper did not offer to settle an asserted claim then in civil litigation. The payment of $1,010 was in full payment of UW–M's claim; *i. e.*, not a compromise but an admission of the asserted liability. We view the query to be: Did the District Court abuse its discretion in admitting the evidence?

Federal Rules of Evidence 403 provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Clearly, the evidence of Hooper's voluntary repayment to UW–M upon confrontation was relevant as a pretrial admission against interest. *See Norling v. Carr*, 211 F.2d 897 at 901 (7th Cir. 1954).

The confrontation of Hooper with the UW–M audit was also relevant as a foundation for Hooper's explanations of forged signatures and missing money to Clara New, as evidenced in New's letter of June 18, 1975. In that letter, New summarizes the reasons given by Hooper for the irregularity of stipend payments, specifically that he signed students' names (1) to be able to readily disburse the funds, and (2) due to advance payments he made to students. Hooper explicitly denied on the witness stand that he had ever made advance payments to students.

We are satisfied that the admission in evidence of those two items was not manifestly confusing to the issues nor misleading to the jury. The District Court did not consider the probative value of either of the two items of evidence to be substantially outweighed by the danger of unfair prejudice. While one might question the advisability of the Government utilizing the two items of relevant evidence in view of the apparent ample quantity of evidence of guilt under Counts 1, 3 and 8, we cannot second guess the Government on that score. The two items of evidence and Hooper's actions relating to them were part and parcel of the charges and of highly probative value. Most certainly they were not distinctly separate and unrelated acts like proof in a trial of prior crimes in which the possibility of great danger of unfair prejudice lurks.

We are satisfied that neither of the two items of evidence presented a danger of unfair prejudice to Hooper within the meaning of Rule 403.

▮ We conclude that the District Court did not abuse judicial discretion or otherwise err under issue 5.

Hooper's judgment of conviction and sentence is affirmed.

AFFIRMED.

SWYGERT, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion on a single but important point. It was reversible error, in my judgment, for the trial judge to allow the prosecutor to introduce into evidence the fact that the defendant paid something in excess of $1000 to the UW–M after an audit showed that amount was unaccounted for in the UBP funds entrusted to the defendant for dispersal. There was testimony that prior to payment one of his supervisors demanded that Hooper pay the money even though no one in charge of the UBP accused him of stealing.

The problem here is covered by Rule 403, Federal Rules of Evidence. The rule reads in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." We are not concerned with a compromise of a claim that was "disputed as to either validity or amount," covered by Rule 404, Federal Rules of Evidence.

The probative value of the offered evidence, if indeed the evidence was logically relevant, was minimal while its prejudicial potential was enormous. The balancing required by the rule weighed substantially in favor of exclusion. First, the payment was coercive in nature. Second, no one "accused Hooper of theft or intentional misconduct; the request for payment was based on mismanagement." Majority opinion, *supra,* p. 221. Third, according to the majority the "advisability of the Government utilizing . . . [this item] of relevant evidence [is questionable] in view of the apparent ample quantity of evidence of guilt . . . ." Majority opinion, *supra,* p. 226. Lastly, Hooper was not charged with stealing government funds; he was indicted and found guilty of wilfully and knowingly misrepresenting certain signatures on the stipend payment roster.

Against this minima of probative value must be measured the likelihood of prejudice to the defendant. That likelihood is obvious. It is not difficult to imagine a juror arguing to his colleagues, "This man paid back the money that was missing. What more proof do we need to show he is guilty?"

"Unfair prejudice" in terms of Rule 403 means that the offered evidence may tend to influence a jury in an unfair manner. One writer has said it this way: "Is the evidence really necessary or substantially helpful to the proponent to establish the probandum for which it is offered, or is it likely that his real purpose is to excite the emotions of the jury against the opponent?" Trautman, Logical or Legal Relevancy—A Conflict in Theory, 5 Vand.L.Rev. 385, 397 (1952). The offered evidence here was not necessary; it could only generate unfair prejudice. In these circumstances the error may not be washed away by the "harmless error" rubric. Even the majority appears to abjure that suggestion.

Nor can the error be excused by saying, as the majority does, that the district judge did not abuse his discretion. Discretion, at least, must function as a sieve to strain out potentially egregious error of the kind we see here. Fundamental trial fairness is at stake. A reversal is called for, and the case should be remanded for a new trial.