UNITED STATES of America, Petitioner,

v.

Honorable Jon O. NEWMAN,
Respondent.

No. 663, Docket 76–3077.

United States Court of Appeals,
Second Circuit.

Argued Dec. 28, 1976.

Decided Jan. 25, 1977.

Joseph S. Davies, Jr., Dept. of Justice, Washington, D. C. (Peter C. Dorsey, U. S. Atty., District of Connecticut, New Haven, Conn., and Jerome M. Feit, Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Andrew B. Bowman, Federal Public Defender, New Haven, Conn., for defendant Margaret Lee Robinson.

John R. Williams, New Haven, Conn., for defendant Patricia Savarese.

Peter Goldberger, Asst. Federal Public Defender, on the brief, for defendants-respondents.

Jack Greenberg, Charles Stephen Ralston, and Lynn Walker, New York City, on the amicus curiae brief of The NAACP Legal Defense and Educational Fund, Inc.

Before SMITH, ANDERSON and TIMBERS, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

On April 21, 1976 Margaret Lee Robinson was indicted by a Grand Jury in the United States District Court for the District of Connecticut for the crime of embezzlement of $1,779 from a federally insured bank in violation of 18 U.S.C. § 656 and for conspiracy to commit that substantive offense, 18 U.S.C. § 371. On the conspiracy count two others, Jethro Brown and Patricia Savarese, were also indicted. The case was assigned for a jury trial to Judge Jon O. Newman and the process of selecting the jury commenced on June 21st. Of the 48 veniremen summoned for jury duty, 40 reported to the court and, after the voir dire and the challenges for cause had been ruled upon, the clerk, at the direction of the court, drew 37 names from the jury box to constitute the jury pool from which the jury panel of twelve and five alternates[1] were to be drawn. The peremptory challenges were then exercised in accordance with F.R. Crim.P. 24: 7 by the Government and 13 by the defendants. The Government peremptorily challenged three White and four Black veniremen, the latter constituting all of the Black veniremen in the jury pool; and the defense so challenged 13 White veniremen. The public defender for the defense then moved to expunge the Government's peremptory challenge of the four Black veniremen on the ground that their exclusion was an act of invidious discrimination by the United States Attorney.

Judge Newman then inquired of the Government whether it wished to state a non-racial reason for challenging the four Black veniremen in the jury pool. The Government however, replied that it did not, on the ground that inquiry into and disclosure of reasons underlying a peremptory challenge were contrary to the nature and purpose of the peremptory challenge.

The case was then continued to permit the defendants to present a statistical analysis to support their claim. The Federal Public Defender's statistical analysis, filed with the court on August 31, 1976, covers a two-year period June, 1974–June, 1976, during which 72 criminal jury trials (including the present case) were held in the following

---

1. The unusually large number of alternates for what was estimated to be a trial of only a few days, was ordered because the trial itself was not scheduled to go forward until late August.

divisions[2] of the United States District Court: Hartford and New Haven.

The basic data was compiled by a student intern, who was a senior at the University of Connecticut Law School and who worked as a researcher in the office of the Public Defender. He reported that for the 47 jury trials which took place at the Hartford seat of court, there were for 23 of those trials no Black individuals in the general array; that out of arrays totalling 2519 people,[3] 10 Black persons appeared 75 times. He also said that there were 17 trials in which potential Black jurors, drawn from the jury pool, were eliminated solely by the Government's peremptory challenges; that out of 47 trials, there were 40 trials in which Blacks were either not present in the array or were eliminated by Government challenge; and out of 47 trials studied, Blacks became jurors four times.

The researcher also made studies of the 24 criminal jury trials held during the same two years in the New Haven and Waterbury seats of court, which draw the veniremen from the same areas, and were, therefore, consolidated for the purposes of the survey. He reported that seven out of 24 trials had no Blacks in the general array; that in arrays totalling 1,581 people, Blacks appeared only 54 times; that of the 31 times that Blacks were chosen for the final panel, they were eliminated 12 times by Government challenge and five times by defense challenge; and that 14 Blacks were empanelled as jurors, three in the trials of Black defendants and 11 in the trials of White or Hispanic defendants.

The researcher presented the foregoing data to the Public Defender in the form of an affidavit which was submitted to the district court judge with the Public Defender's brief in support of his motion to strike the Government's jury challenges. The Government, proceeding on the assumption that, for the purposes of this mandamus proceeding, the statistics presented by the defendants were accurate, thereafter filed with the court a short brief with its own statistical analysis of the material in the researcher's affidavit. This affidavit and the Government's representations, made in connection with the statistical analysis, furnished the basic evidentiary materials from which the district court drew the following conclusions of fact:

In trials of Black or Hispanic defendants over the past two years in Hartford, New Haven and Waterbury, 33 Blacks had been included in the final group eligible for jury

2. The divisions are set out in Part IV of the Jury Selection Plan for the United States District Court for the District of Connecticut, established by order of the court on September 23, 1968 as amended, which part designates the county or counties from which each seat of court, i. e., Hartford, New Haven, including Waterbury and Bridgeport will draw its venire for jury service.

3. According to the researcher's report on the Hartford seat of court during the two-year period, there were 47 trials, during 23 of which the "general array" (presumably the jury box with all of the names of persons on the jury list— each name with address on a separate card— inside of the box) contained no name of a Black person. He further reported that out of arrays totalling 2519 people, 10 Black persons appeared 75 times.

In the very next paragraph of the text of this opinion we note that the researcher reported that for the New Haven Division ". . . in arrays totalling 1591 people, names of Blacks appeared only 54 times." But there is no information reported there or anywhere in the record, about the total number of veniremen in the general arrays, that is, the total number of names in the jury boxes, for any particular period of time. See affidavit of Judge Newman, dated December 14, 1976, at n. 4. What to the researcher is simply an "array" is presumably the number of veniremen ordered by the court to be drawn from the jury box to constitute a pool from which trial juries for one or more cases are drawn. The researcher's large totals of 2519 and 1591, above mentioned as total arrays, are the result of adding all of the jury pools drawn from the box, with one superimposed upon another regardless of the extent to which succeeding pools are composed of the same individuals. When a pool has served its purpose and the trials of the cases for which the pool was drawn have finished, the names are put back in the box and many of the same veniremen are used over and over again. What significance lies in a grand total of all of the used pools is far from clear; and it is even more confusing when there is no way of knowing what veniremen are used, not once, but several times.

selection, of which the Government had peremptorily struck 28, resulting in an "exclusion rate" of 84.8%. In cases involving White defendants, 49 Blacks were again in the "final group." The Government challenged 29 of these, resulting in an "exclusion rate" for this category (Blacks struck in the trials of White defendants), of 59.2%. Putting the two "exclusion rates" together (Blacks peremptorily struck by the Government in the trial of Blacks, White or Hispanics) yielded an overall "exclusion rate" of 69.5%.

On October 15, 1976, Judge Newman filed a memorandum and order. He decided ". . . that the pattern of government peremptory challenges of Black veniremen has now reached an excessive point that calls for the exercise of this court's supervisory power over the conduct of criminal trials in this District." He also said,

". . . [T]he high rate of exclusion of Black veniremen and the fact that the rate is higher for trials of minority defendants than White defendants indicates that in a large number of instances Black veniremen were challenged because they were Black. Even in these instances, though the prosecutor's *intention* is clearly to exclude a person because he is Black, the prosecutor may have a *motivation* unrelated to any hostility toward Blacks. He may simply believe that a Black juror may be somewhat partial to a Black defendant." (Footnote omitted.)

The remedy which the district court ordered for the case presently before us, provided ". . . the appropriate remedy is to disallow the challenge of the four Black veniremen and resume the jury selection process with those four names included." As a prospective remedy in addition to the foregoing, the district court further ordered the United States Attorney's Office thereafter ". . . to maintain a record for each criminal trial of the number of Blacks included in the final panels against which peremptory challenges are exercised and the number of Blacks challenged peremptorily by the prosecutor without explanation."

We turn now to a consideration of the evidentiary material, principally the statistical data, presented by the Public Defender on which the factual conclusions of the district court essentially rest. The district judge said, ". . . I . . . accept as true the facts submitted in the . . . [researcher's] affidavit." These facts are the basis for its ultimate holding that the present system and operation of the Government's peremptory challenges in the District of Connecticut produce an invidiously discriminatory pattern of Black exclusion from the juries in criminal cases in the United States District Court for the District of Connecticut. On review, it is the opinion of this court that the evidence submitted is inadequate in kind and quality and particularly in its relevancy and accuracy to support the conclusions reached as they bear upon the present case,[4] which concerns the rights of one Black defendant and one White defendant on trial in the New Haven Division of the United States District Court for the District of Connecticut. What procedures were being used in selecting jurors in the Hartford Division at that time had no bearing or effect upon the defendants in the case before us.[5]

4. As the Supreme Court stated in *Swain v. Alabama*, 380 U.S. 202, 228 n. 32, 85 S.Ct. 824, 840, 13 L.Ed.2d 759:

". . . Absent a showing of purposeful exclusion of Negroes in selection of veniremen, which has not been made, the lower proportion of Negroes on the venire list sheds no light whatsoever on the validity of the peremptory strike system or on whether the prosecutor systematically strikes Negroes . . . . ."

5. The New Haven Division of the United States District Court for the District of Connecticut, was created under that Court's Plan for the Random Selection of Grand and Petit Jurors, adopted June 21, 1968 in compliance with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.*; and in 1973, after jury verdicts of guilty and convictions for bank robbery in the United States District Court in New Haven, Connecticut, in the New Haven Division, the defendant Jenkins and others claimed that they were denied a fair trial because the procedure used to select the jury panel resulted in discrimination against Negroes, and that there was a substantial disparity between the percentage of Negroes in the community and

In gathering the evidentiary material having to do with the statistics out of which the facts of the case are found, however, the researcher who marshalled the figures, compiled the information from the jury lists of the Hartford and New Haven Divisions over a two-year period, 1974–76. The result of making a composite of these two Divisions was to make a survey which was accurate for neither the New Haven Division nor the Hartford Division. This merger of statistics and other facts persisted throughout and were instrumental in the formulation of the court's conclusions, even though the instant case is being tried only in the New Haven Division. Of course, several groups of statistics and descriptions of relevant cases and their significant features were separately discussed as matters occurring in the Hartford Division and likewise some matters occurring in the New Haven Division were separately mentioned, but the district court's conclusions and ultimate ruling were based upon the combined studies of both divisions. This course was adopted by the Federal Public Defender for the purpose of strengthening the charge against the office of the United States Attorney for the District of Connecticut that it had exercised its peremptory challenges with the purpose of invidiously discriminating against the use of Black persons as jurors.

Although the principal issue, raised by this petition for mandamus, concerns the Government's use of its peremptory challenges, sight must not be lost of the fact that it arises out of a federal trial of one Black and one White defendant in the New Haven Division of the United States District Court for the District of Connecticut. This motion is concerned with the rights of these defendants in having a fair and impartial jury and one which represents a fair cross-section of the community. That "community" for the purpose of selecting the jury is the New Haven Division and the court is concerned with the procedures used in that Division for jury selection in the cases of these two accused. By using the present case as the vehicle for an attack upon the United States Attorney's use of peremptory challenges and by proceeding from the recognition of the fact that the United States Attorney performs his functions and duties throughout the entire federal district, the Federal Public Defender has adopted the device of merging jury selection statistics as if juries were selected on a District-wide basis, which they are not. There has been continuously in operation, throughout the period of this case, the "Plan for Random Selection of Grand and Petit Jurors" which divided the District into three divisions, and that Plan is binding upon the district court. It is only the New Haven Division and its procedures for selecting the jury in this case which are relevant. By merging the New Haven Division statistics with those of the Hartford Division, the district court has, as mentioned above, greatly distorted and arbitrarily altered the statistics of the New Haven Division which are, as thus changed, made useless.

In the course of his opinion the district court judge hypothesized a statistically derived, expected rate of Black inclusion on juries, as an acceptable standard. The court said,

"If 12 names are randomly drawn from a group of 28 that includes 2 Blacks, at least one Black would be included in the 12 approximately 68% of the time. This 68% is the expected frequency of juries that would include at least one Black out

those on the jury list. They claimed that the disparity of 2–15% or 5–3 violated the Act of 1968 and their constitutional rights, and should have been compensated for by selecting jurors from other sources in addition to the voting lists. Judge Newman, the district judge, found the disparity was 6%—3% between the census figures and the voter registration figures for the New Haven Division community and a correction would add only 1 additional Black to

50–60 veniremen which was not substantial enough to deprive the defendants of their rights. On appeal this court affirmed, *United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974), and approved the jury lists and panels selected through the procedures adopted by the United States District Court for the New Haven Division pursuant to the Plan, and there has been no showing in the present action which calls for a different result.

of the universe composed of final panels with the average number of Blacks that were present in the final panels in this District.[6]

[6] Since the prosecutors can challenge peremptorily 6 of the 28 in these final panels, the average of 2 Black jurors per final panel would be reduced to 1.57 $(2 - (6/28 \times 2))$ if the prosecutors' peremptories were exercised neutrally as to race. If 12 names are drawn from a group of 22 (the initial 28 minus the 6 challenged by the prosecutor) that includes, on the average, 1.57 Blacks, the frequency with which at least one Black would be included in the 12 remains at approximately 68%."

Comparing the 68% expected rate with the actual rates in the separate Hartford and New Haven Divisions, it is abundantly clear that the rate experienced in the Hartford Division falls far below the standard, while the New Haven Division's performance substantially equates the standard, and any difference between the New Haven Division and the standard is de minimis. The figures are as follows:

### The New Haven Division

In New Haven, out of 24 cases analyzed, there were 15 trials with final panels which included an average of 2 Blacks. Of those 15 trials, a Black juror served in 9 trials.

Taking into account the district judge's "expected" rate of 68%, of those 15 trials, Blacks should have appeared on juries in 10 cases. In actual fact, they appeared on 9 juries. (On one of the 15 final panels, 2 Black veniremen were challenged—one by the Government and the other by the defense. If either had withheld its challenge, the New Haven Division would have met the district court's standard of 68% or 10 trials.)

6. The report on the Hartford Division about the number of Black veniremen who were peremptorily challenged by the Government in connection with several criminal trials presents those challenged as a fairly sizeable group of separate Black individuals, qualified for jury duty but cut off from the opportunity to serve because each had been struck by the Government. A study of the raw data, also furnished by the Federal Public Defender, discloses, however, that one of the group, S. W. Shepherd, was struck no less than six times by the Government, while two others in the group, M. Angus and W. Williams, were struck five times

Translating these figures into percentages, 9 juries with one or more Black members out of 15 final panels, each of which includes an average of 2 Blacks gives a figure of 60% Black participation. The district court's expected percentage rate of Black "inclusion" is 68%.

The result of the above statistics is that the New Haven Division's record, the only one relevant for purposes of this case, compares very favorably with the standard hypothesized by the district court.

### The Hartford Division

In Hartford, on the other hand, quite a different story is presented. Out of 47 trials analyzed in the Hartford Division, 23 final panels had an average of 2 Blacks per panel. Of those 23 trials, only 4 had a Black on the jury. Taking into account the district court's "expected" rate of 68%, Blacks should have appeared on 15 juries.

Again translating the Hartford Division figures into percentages so as to point up the comparison, 4 Hartford juries with a Black member out of 23 final panels including an average of 2 Blacks, result in a figure of 17% Black participation. This must be compared with the district court's 68% expected rate of Black "inclusion" on juries.[6]

While for several centuries in Anglo-American law inquiry into the reasons prompting an accused defendant to exercise a peremptory challenge have been barred and foreclosed and, likewise in this country for more than a century, such an inquiry or investigation into the reasons inducing a

each. Assuming that the researcher's statistical analysis counted each Government peremptory challenge as striking a qualified potential Black juror and disregarding the fact that the same individuals were being challenged several times, it appears, in effect, that three Black veniremen were single-handedly responsible for no less than 16 peremptory challenges against Blacks in the Hartford Division. This counting of the same individuals several times, obscures the reliability and accuracy of the claimed facts and injects confusion into the real significance of the statistics.

peremptory challenge by the prosecutor has also been precluded, the Supreme Court decision in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), though it strongly reiterates the strictures against compelling an inquiry or disclosure of reasons or circumstances prompting or inducing the exercise of a peremptory challenge, 380 U.S. at 220, 85 S.Ct. 824, in Part III of the court opinion, indicates that circumstances *might* exist under which interrogation of a prosecutor as to the reasons for his long, consistently repeated peremptory challenges, exercised solely against Black veniremen to exclude them from sitting on a jury, *might* be pursued. Suffice it to say that in this case the defendants have not shown, by the kind, quantity and quality of evidence which is necessary to sustain the very heavy burden of proof which rests upon them, that they were deprived of due process by the procedures used in selecting a jury for their trial in the present case. Nor under the circumstances did the defendants under any existing law have the right to inquire into and interrogate the prosecutor about his reasons for peremptorily challenging the four Black veniremen in the jury pool. *Swain v. Alabama, supra,* is the governing authority on this matter. In that case the Black defendant challenged the trial jury venire and the trial jury subsequently drawn from it, because the prosecutor's six peremptory challenges removed the only available Black members of the venire summoned in the case. In evaluating the Fourteenth Amendment challenge against the prosecutor's striking of the six Black veniremen in *Swain*, the Court thoroughly reviewed the history and development of the peremptory challenge system and stated, as its basic holding:

"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." 380 U.S. at 220, 85 S.Ct. at 836.

In inviting the United States Attorney in the present case, therefore, to provide the court with a "nonracial" reason for the exercise of his four peremptory challenges against Black veniremen, the district judge erred with respect to *Swain's* standards in two respects: (1) by asking for a reason; and (2) thereby potentially subjecting the Government's exercise of its peremptory challenges to the court's control.

In Part II of the majority opinion in *Swain*, the Court discussed other facets of the nature and function of peremptory challenges, principally in the course of deciding the petitioner's claims that the prosecutor exercised the State's peremptory challenges for the purpose of excluding Negroes from serving on petit juries and for that reason the trial jury array should be stricken. The Court said,

"The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way "justice must satisfy the appearance of justice." '. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942. Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause. Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' *Hayes v. Missouri*, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578.

. . . [The peremptory challenge] is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not wheth-

er a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. . . . [V]eniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. . . .

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. . . . " 380 U.S. at 219–222, 85 S.Ct. at 835–837. (Footnotes omitted.)

The Supreme Court affirmed the action of the State courts in denying the defendant's motion to strike the trial jury array.

In Part III of the Supreme Court's opinion in *Swain*, it engaged in an abstract discussion of how the Court *might* deal with a situation described by the petitioner and claimed by him to have been what actually had occurred in the trial of his case as an example of the historic characteristics of jury trials as they were in Talladega County from 1950 to 1965. In short, the petitioner in *Swain* argued that,

" . . . [N]ot only were the Negroes removed by the prosecutor in this case but that there never has been a Negro on a petit jury in either a civil or criminal case in Talladega County and that in criminal cases prosecutors have consistently and systematically exercised their strikes to prevent any and all Negroes on petit jury venires from serving on the petit jury itself. This systematic practice, it is claimed, is invidious discrimination for which the peremptory system is insufficient justification." 380 U.S. at 222–223, 85 S.Ct. at 837.

In speculating on looking into the prosecutor's responsibility for such a state of affairs the Court commented that it would reject the wooden application of various tests devised primarily to determine racial discrimination on the part of jury commissioners who represent the State in quite a different role from that of a prosecutor or defense counsel in exercising peremptory challenges. 380 U.S. at 226–27, 85 S.Ct. 824. The Court went on to say:

"But the defendant must, to pose the issue, show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time. This is the teaching of *Hernandez v. State of Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76. We see no reason, except for blind application of a proof standard developed in a context where there is no question of state responsibility for the alleged exclusion, why the defendant attacking the prosecutor's systematic use of challenges against Negroes should not be required to establish on the record the prosecutor's

conduct in this regard, especially where the same prosecutor for many years is said to be responsible for this practice and is quite available for questioning on this matter." 380 U.S. at 227–28, 85 S.Ct. at 839. (Footnote omitted.)

It appears that such an inquiry, however, might only be triggered by proof of a purposeful exclusion of Blacks from juries over a substantial period of time. In *Swain* the Court said shortly preceding the above quotation:

" . . . [W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. Cf. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. In these circumstances, giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify." 380 U.S. at 223–224, 85 S.Ct. at 837.

The wording of Part III of the opinion does not decide or pretend to decide the hypothetical question presented by the petitioner, which could not be decided by the Court because the issue was not presented by the record. Justice Harlan's concurring opinion (380 U.S. at 228, 85 S.Ct. 824) makes this explicitly clear. At best, it is an educated guess as to the position that the majority of the Court would probably take if the same question, supported by a record, came before it. Such an occurrence is, of course, not possible. It is, however, interesting to note what circumstances the dissenters in *Swain* felt would justify breaching the otherwise impenetrable wall of non-disclosure of reasons which prompt a peremptory challenge. In the dissenting opinion written by Justice Goldberg, he said,

" . . . [W]here, as here, a Negro defendant proves that Negroes constitute a substantial segment of the population, that Negroes are qualified to serve as jurors, and that none or only a token number has served on juries over an extended period of time, a prima facie case of the exclusion of Negroes from juries is then made out; that the State, under our settled decisions, is then called upon to show that such exclusion has been brought about 'for some reason other than racial discrimination,' *Patton v. Mississippi, supra*, 332 U.S., at 466, 68 S.Ct., at 186; and that the State wholly fails to meet the prima facie case of systematic and purposeful racial discrimination by showing that it has been accomplished by the use of a peremptory challenge system unless the State also shows that it is not involved in the misuse of such a system to prevent all Negroes from ever sitting on any jury. Such a holding would not interfere with the rights of *defendants* to use peremptories, nor the right of the State to use peremptories as they normally and traditionally have been used.

It would not mean, as the Court's prior decisions, to which I would adhere, make clear, that Negroes are entitled to proportionate representation on a jury. *Cassell v. Texas, supra*, 339 U.S., at 286–287, 70 S.Ct., at 631 (opinion of Mr. Justice Reed). Nor would it mean that where systematic exclusion of Negroes from jury service has not been shown, a prosecutor's motives are subject to question or

judicial inquiry when he excludes Negroes or any other group from sitting on a jury in a particular case. Only where systematic exclusion has been shown, would the State be called upon to justify its use of peremptories or to negative the State's involvement in discriminatory jury selection." 380 U.S. at 244–245, 85 S.Ct. at 849. (Footnote omitted.)

The principal difference between the majority and the dissent is that the former found that the record of the case did not present the question of invidious exclusion from jury service because of race, which the majority postponed until another day, while the latter found that the case presented "a clear record of jury exclusion because of race." Neither suggested or implied that the majority or dissenters favored opening a breach in the protective wall surrounding the exercise of a peremptory challenge for such inconclusive, confusing and unpersuasive reasons as those claimed under the circumstances of the present case.

■ As the evidence in this case is presented entirely on court or other official records and on affidavits, the reviewing court is in as good a position as was the trial court to pass upon matters of weight and credibility.

■ We are not satisfied that there is a persuasive showing that the prosecutor, in connection with the present case, had either the motivation or the intention, invidiously to exclude Black persons from serving on juries in the New Haven Division of the United States District Court for the District of Connecticut. What reasons were volunteered for the peremptory challenges by the prosecution were not "wholly unrelated to the outcome of the particular case on trial," *Swain, supra,* 380 U.S. at 224, 85 S.Ct. at 838, and "[t]he presumption in any particular case must be that the prosecutor is using

the . . . challenges to obtain a fair and impartial jury to try the case before the court." 380 U.S. at 222, 85 S.Ct. at 837. As the trial court noted, "the prosecutors honestly believed that the striking of Black veniremen would lessen the risk of bias in favor of the defendant and thereby increase the likelihood of a bias free jury." A prosecutor's opinion that particular veniremen are likely to base their conclusions as jurors on emotional factors such as fear, hate, or sympathy or pity rather than upon the evidence in the case in the light of the court's instructions of law, as it is their duty to do, is not an act of invidious racial discrimination. In fact, both the legislative history, 1968 U.S.Code Congressional and Administrative News, pp. 1794–95 (90th Cong. 2nd Sess.) and *Swain* make it clear that peremptory challenges may be exercised for purely subjective reasons, "which may very well be imagined or incorrect." Far from seeking to prevent all Blacks from ever sitting on any jury or to exclude all Blacks, qualified to serve as jurors, from serving on juries in civil or criminal cases or to confine them to token representation, the Government's Supplemental Response to the Respondent's statistics, which assumed their accuracy, contended that the adult Black population of Connecticut is 5% of the total, and Blacks constitute 3.15% of the jury lists.[7] They constitute 2.11% of the jurors, and they have served on cases with Black defendants and cases with White defendants. There is, therefore, a disparity of 2.89% which is far below the 10% figure of which the Supreme Court said in *Swain,* "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." 380 U.S. at 208–209, 85 S.Ct. at 829. Moreover, on the defendants' statistics, of the 71 jury trials in criminal cases in the Hartford and New Haven Divisions, during the peri-

**7.** In a footnote to the Affidavit submitted to this court, the district judge characterized the origin and relevancy of the 3.15% figure as "somewhat obscure." The figure was derived by establishing the number of Blacks included in general arrays, the total number of people included in those same arrays, and determining the percentage of Blacks in the total. The raw data for this computation came from defendants' figures, as pointed out by the Government in its Supplemental Response.

od of the study (exclusive of the present case) Blacks were members of jury panels 17 times and an alternate once. There has been no finding that there was a "racist" plan or purpose involved in the exercise of peremptory challenges by the Government.[8] Apparently two of the Assistant United States Attorneys in the District of Connecticut were themselves Black.

We conclude that the deprivation of due process claims made by the defendants in this case have no support in law nor do the facts alleged have support in the evidence.

It is the opinion of the court that the petition for mandamus should be granted, ordering the rulings of the district court which directed that the names of the four challenged veniremen be restored to the final panel in this case be vacated and set aside. Likewise, this court orders that the direction by the district court to the United States Attorney to maintain statistics on the peremptory challenges by the Government and to report them to the Federal Public Defender where they would be available to the public also be vacated and set aside.

There is no authority for such modifications of the jury selection process, which was by formal vote, adopted by the district court, sitting in banc, and which was subsequently approved by the Council of the

Second Circuit. The Federal Rules of neither Civil nor Criminal Procedure authorized these measures which violate the provisions of 28 U.S.C. § 1861, et seq.

In the present case the novel and drastic remedies prescribed by the district judge, require that this court invoke its power under the All Writs Act, 28 U.S.C. § 1651(a), because of the unprecedented assumption of power implicit in decreeing those remedies. *DeBeers Consolidated Mines Ltd. v. United States*, 325 U.S. 212, 217, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945). This has created exceptional circumstances calling for the exercise of supervisory power of this court over the district courts to insure "proper judicial administration in the federal system." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–60, 77 S.Ct. 309, 315, 1 L.Ed.2d 290 (1957).

*Will v. United States*, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), is not to the contrary. In *Will*, the Supreme Court denied mandamus of a trial court's interlocutory order in a criminal case, noting the strong judicial and legislative policies against Government appeals in criminal cases, which could not be controverted by a liberal use of mandamus as a "substitute for appeal," 389 U.S. at 96–97, 88 S.Ct. 269. The Court did, however, acknowledge the "vital corrective and didactic function" of mandamus and also wrote:

8. Blacks are the major victims of wrongdoers and it is unlikely that they hesitate to convict where the case warrants it. All of the members of this court, hearing the present case, have served more than a decade as judges of the United States District Court for the District of Connecticut. It has been our experience that Black persons, summoned and drawn for jury panels in that court, have been excellent jurors and have shown no predilection to favor or harm any group, class or kind of persons but have judged the facts on the evidence presented in court in the light of the court's charge.

The right to peremptory challenges is of great importance, both to the Government and to the defendants—but mostly to the defendants, because they are personally involved in the result of the trial and for this reason usually have more of the peremptory challenges than the Government. These challenges provide one of the most effective assurances that a party will have a fair and impartial jury. If, for

example, a defendant knows or has a strong suspicion that a particular venireman is hostile to him or believes the venireman has strong or militant views which would make it unlikely, in spite of the court's instructions, that the venireman would give fair and impartial consideration to the case, and yet the defendant does not have available sufficient evidence to prove these disqualifications on a challenge for cause, he can solve the problem with a peremptory challenge. The same considerations apply to a plaintiff or a prosecutor. Once, however, a plaintiff or prosecutor is required to submit to interrogation concerning his reasons for making a peremptory challenge, it will probably not be long before defendants will be required to do likewise. This, in all likelihood, would spell the end of peremptory challenges; and Blacks and other recognizable minority groups would thereby suffer a major loss in the removal of one of the greatest safeguards the law has provided for a fair trial.

"This is not to say that mandamus may never be used to review procedural orders in criminal cases. It has been invoked successfully where the action of the trial court totally deprived the Government of its right to initiate a prosecution, *Ex parte United States*, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), and where the court overreached its judicial power to deny the Government the rightful fruits of a valid conviction, *Ex parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916). But this Court has never approved the use of the writ to review an interlocutory procedural order in a criminal case which did not have the effect of a dismissal. We need not decide under what circumstances, if any, such a use of mandamus would be appropriate. It is enough to note that we approach the decision in this case with an awareness of the constitutional precepts that a man is entitled to a speedy trial and that he may not be placed twice in jeopardy for the same offense." 389 U.S. at 97–98, 88 S.Ct. at 275.

*See also,* Note, *Supervisory and Advisory Mandamus, Under the All Writs Act,* 86 Harvard L.Rev. 595, 622 (1973) ("It should be clear, however, that the [*Will*] case . . . does not represent an invalidation of uses of supervisory mandamus authorized by the model described above; on the contrary, it reaffirms the validity of those uses.")

■ This court has already concluded that the district court's findings of fact and conclusions of law in this case were in error and, in view of its abrupt departure from the statutes and rules, as well as from the District's own Plan for the Random Selection of Grand and Petit Jurors, it is one of those "extraordinary causes" for which "extraordinary remedies" such as mandamus are appropriate, *Ex parte Fahey,* 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947), because the district court's opinion cannot but have an immediate and continuing detrimental impact on the administration of criminal justice in the District of Connecticut. *United States v. Lasker,* 481 F.2d 229 (2d Cir. 1973), *cert. denied,* 415 U.S. 975, 94 S.Ct. 1560, 39 L.Ed.2d 871 (1974); *United States v. Weinstein,* 452 F.2d 704 (2d Cir. 1971), *cert. denied sub nom., Grunberger v. United States,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Among other things it is likely to bring about interminable delays in criminal trials as the result of constant defense challenges to arrays and final panels every time a Black is peremptorily challenged by the United States Attorney's office or in case no Black happens to be drawn on an array or final panel.

The petition for mandamus is granted and the writ may issue accordingly.

On remand the district court will afford the defendants the opportunity, in accordance with the suggestion by Judge Newman in open court on November 29, 1976, to proceed with the present jury after the three members, previously ordered onto the final panel by the district court, have been removed, and that the places of the discharged members of the jury panel be filled by the two remaining alternates, and that the two unassigned veniremen from the jury pool take the places of the two alternates who have become members of the jury panel.

In the event that the two defendants fail to agree on the above procedure, the cases will have to be severed. If the defendants do not elect to proceed as first suggested above, the district judge will declare a mistrial and order that the case be reassigned for trial with reasonable promptness.

It is so ordered.