**UNITED STATES OF AMERICA, Plaintiff**

v.

**ORLANDO CANEL and JOSE (TONY) FIGUEROA,
Defendants**

Criminal No. 82-72

District Court of the Virgin Islands

Div. of St. Thomas and St. John

November 17, 1982

JAMES A. PLAISTED, ESQ., Special Assistant U.S. Attorney (Office of the U.S. Attorney), St. Thomas, V.I., *for plaintiff*

MARIA T. HODGE, ESQ., St. Thomas, V.I., *for defendant Jose Figueroa*

JOAQUIN MONSERRATE MATIENZO, ESQ., Hato Rey, Puerto Rico, *for defendant Jose Figueroa*

MICHAEL A. JOSEPH, ESQ., Federal Public Defender (Office of the Federal Public Defender), Christiansted, St. Croix, V.I., *for defendant Orlando Canel*

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND ORDER

The defendants in this case were originally charged with one conspiracy count and twelve other federal "white collar crimes" arising out of two separate sets of circumstances. The first set of circumstances involved the alleged unauthorized use of work crews and equipment of the Virgin Islands Department of Public Works on property owned by one of the defendants for his personal benefit. The second set of circumstances involved government purchases by

defendant Canel, in his capacity as a division head within the Department of Public Works, of three trucks from defendant Figueroa, who falsely represented himself as an administrator of a bankrupt estate in Puerto Rico. Specific acts alleged in the conspiracy count included the use of the telephone for the numerous telephone calls made from the Department of Public Works to Puerto Rico, preparation of various documents to cover up the fraud, and interstate travel.

All the counts involving the unauthorized use of the government work crews and equipment were dismissed by the Court on defendants' motion for acquittal at the end of the prosecution's case. The jury was left to consider seven of the original thirteen counts dealing with the truck purchases. At the close of all the evidence defendants renewed their motion of acquittal and it was denied.

Defendant Canel was convicted on all seven counts. Defendant Figueroa was convicted on five of the seven counts. Each was convicted of conspiracy, obtaining money by fraud, use of interstate telephone wires, and making and using false documents. Defendant Canel was also convicted of two additional counts of making and using false documents.

Both defendants filed motions for judgment notwithstanding the verdict or in the alternative for a new trial. The motions will be denied for the reasons stated herein.

## I. JURISDICTION UNDER 18 U.S.C. §§ 1001, 371

Defense counsel separately raise and join in each other's motion the question as to whether the defendants could be found guilty under the federal statutes 18 U.S.C. §§ 1001, and 371 when, they allege, the acts were committed against the Virgin Islands Government. Basically, counsel argue that the transactions the defendants were found guilty of are all against the territory and are not "within the jurisdiction of any department or agency of the United States" nor was the conspiracy committed against "the United States, or an agency thereof," as required by those statutes.

This Court does not dispute the fact that the defendants could have been found to have defrauded the Virgin Islands Government under Virgin Islands law. See 14 V.I.C. §§ 551, 843. The Court does not dispute in this case the fact that the Virgin Islands Government, particularly the Department of Public Works, is not the United States Government or a federal agency or department. See Harris v. Boreham, 233 F.2d 110, 114–16 (3d Cir. 1956) (V.I. municipality not a federal government department or agency); see also Dudley v.

Commissioner of Internal Revenue, 258 F.2d 182 (3d Cir. 1958) (U.S. Tax Court lacked jurisdiction to hear tax deficiency appeal because notice issued by territorial officer). The Court finds, however, that a violation has been committed against a federal department, the U.S. Department of Interior, as well.

A. *Section 1001—Counts 10, 11, 12 and 13*

Counts 10, 11, 12 and 13 alleged that the defendants made and used false and fraudulent statements to purchase two tractor-trailer trucks and a dump truck, more specifically: to procure a disbursement Voucher for $35,000; to justify the "open market" purchase of the dump truck in a letter to the Governor written by defendant Canel; to certify that defendant Figueroa was the vendor of the dump truck in a requisition; and to procure a Government Transportation Request to Puerto Rico. The transactions were all done in violation of 18 U.S.C. §§ 1001 and 2. Section 1001 provides

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The issue, as phrased by counsel for defendant Figueroa, and paraphrased here, is whether the fact that the U.S. Department of Interior has lawful authority to audit the financial affairs of the Virgin Islands Government renders a fraud basically against the Virgin Islands Government an offense against the U.S. Government or one of its agencies or departments. The prosecution, responding in the affirmative, argues that because the fraudulent statements found their way to the federal government comptroller, an agent of the U.S. Department of Interior, as a part of his statutory auditing functions, the documents and statements made constituted a fraud against the U.S. Department of Interior. The auditing of these records, it is further argued, is a matter "within the jurisdiction" of a federal department, citing to United States v. Cartwright, 632 F.2d 1290 (5th Cir. 1980). We agree with the prosecution.

■ Under section 17 of the Revised Organic Act of 1954 (hereafter the "Act"), 48 U.S.C. § 1599, the financial affairs of the Virgin

Islands Government are monitored by a government comptroller who is appointed by the Secretary of the U.S. Department of Interior (hereafter the "Secretary") and is under his general supervision. Section 17(a) specifically provides that the government comptroller is not part of any executive department of the Virgin Islands Government (hereafter the "Government"). He is mandated to audit all expenditures of funds pertaining to the Government which includes bringing to the attention of the Secretary of the Interior and the Governor of the Virgin Islands all irregular expenditures of funds. The office and activities of the government comptroller are subject to review by the Comptroller General of the United States. While the government comptroller may perform some territorial functions,[1] he is a federal employee or agent of the U.S. Department of Interior. See Harris v. United States, 125 F.Supp. 536, 541 (D.V.I. 1954) (Superintendent of Public Works for the municipality of St. Thomas and St. John, appointed and paid by the Secretary, was a "federal employee" under the Federal Tort Claims Act although he performed both territorial and federal functions).

Cartwright involves a case where defendant was convicted under § 1001 for submitting false statements to a lending institution which was a wholly-owned subsidiary of a federally-insured savings and loan association. The federal agency had statutory authority to "make examinations" into the institutions it insured "for its protection and the protection of other insured institutions," which authority was extended, in that case, to the wholly-owned subsidiary. Fraudulent statements submitted by defendant to the subsidiary were considered "within the jurisdiction" of the federal agency. The U.S. Supreme Court, in discussing the amendment to 18 U.S.C. § 80, later renumbered 18 U.S.C. § 1001, which added the phrase "within the jurisdiction of any department or agency of the United States," stated:

> The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.

United States v. Gilliland, 312 U.S. 86, 93 (1940).

■ In the present case, the government comptroller has statutory authority to audit the Government's expenditures. The purposes of the government comptroller's auditing activities are to:

---

[1] See 48 U.S.C. § 1405v.

improve the efficiency and economy of programs of the government of the Virgin Islands, and . . . discharge the responsibility incumbent upon the Congress to insure that the substantial Federal revenues which are covered into the treasury of the government of the Virgin Islands are properly accounted for and audited.

48 U.S.C. § 1599(c). The submission of fraudulent documents would and does interfere with the lawful functions of the government comptroller, which includes accounting for and auditing the federal revenues as well as the territorial revenues. The submission of these documents, therefore, does involve matters "within the jurisdiction" of the U.S. Department of Interior.

The defendants cite to Ebeling v. United States, 248 F.2d 429 (8th Cir.), cert. denied, sub nom., Emerling v. United States, 355 U.S. 907 (1957), a case which the Third Circuit cited as controlling in United States v. Waters, 457 F.2d 805 (3d Cir. 1972), as controlling in the present case. They argue that the prosecution was required to prove that the defendants knew of the federal involvement with the Department of Public Works. We disagree. Ebeling may very well stand for the proposition that where a federal agency is peripherally involved, proof is required that the defendants had actual knowledge of federal involvement. The present case is more akin, however, to cases where a federal agency has an interest in protecting its authorized functions and proof of knowledge of federal involvement is not necessary. Cartwright, supra, United States v. Standford, 589 F.2d 285, 297 (7th Cir. 1978), cert. denied, 440 U.S. 983 (1979). Even the court in Ebeling acknowledges that a broader standard applies in cases involving federal regulation:

> If the false writing or document constitutes a legally required record under a statute in some regulatory field, there may be an even broader liability under the section but that aspect is not here involved and calls for no consideration.

248 F.2d at 434. See also Bryson v. United States, 396 U.S. 64, 71 (1969) (statutory basis for federal agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001).

Even if we adopt defendants' application of Ebeling, their argument still fails. Defendant Canel, at the time of the transactions, was the Director of the Division of Roads and Highways in the Department of Public Works in the Government. As head of this

301

division, one of his duties was to procure equipment like in issue here and this Court finds it difficult not to impute knowledge to Canel of the federal auditing procedures for expenditures made in his division which would eventually be brought to the attention of the government comptroller. Although the prosecution did not directly bring this point out, the jury had before it the character testimony of Gordon Finch, the Commissioner of Public Works while defendant Canel was head of the Division of Roads and Highways. Mr. Finch stated that Canel was the most efficient of his directors and if he were appointed again as Commissioner he would reappoint Canel to the same position. An efficient director of a government division surely would know the administrative process regarding division expenditures. The evidence presented was sufficient to infer that defendant Canel knew that the false statements would be brought to the attention of the government auditor, a federal agent, in the process of auditing the division's expenditures.

■ The above analysis applies as well to defendant Figueroa. As an aider and abettor, he is liable as a principal. 18 U.S.C. § 2. See also United States v. Catena, 500 F.2d 1319, 1323 (3d Cir.), cert. denied, 419 U.S. 1047 (1974) (person guilty of fraud against agent of U.S. even if he uses an innocent intermediary under 18 U.S.C. § 2(b) and § 287, a statute narrower on its face than § 1001.)[2]

B. *Section 371—Count 1*

Count one alleges conspiracy to defraud the United States under 18 U.S.C. § 371 by using interstate wire communications and transporting in interstate commerce money or property in violation of 18 U.S.C. §§ 1343 and 2314. The alleged conspiracy also included the misrepresentation to "public officials" regarding the role of defendant Figueroa as a bankruptcy administrator, the savings for purchasing the three trucks through Mr. Figueroa, and the cover-up.

■ ■ The United States Supreme Court, in a case involving 18 U.S.C. § 88 (1940 ed.), of which that section and 18 U.S.C. § 294 were consolidated into § 371, stated:

---

[2] Even if Ebeling were applicable to this case, the Court is not inclined to give it much weight. Ebeling is cited in Waters, supra, as controlling without discussion of the facts or the legal principles involved. The major contention was that the alleged false records were directed to the Urban League of Philadelphia, a contractor with the U.S. Department of Labor, and not government agency. The Third Circuit held that the appeal was without merit and upheld the conviction. This Court doubts that that case is factually similar to the present case.

> The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of government.

Haas v. Henkel, 216 U.S. 462, 479 (1909), quoted in United States v. Winkle, 587 F.2d 705, 708 (5th Cir. 1979). The counts of which the defendants were convicted were based on facts, especially the cover-up, which impaired or obstructed the lawful function of the U.S. Department of Interior through the government comptroller which was to accurately audit the Department of Public Works and recommend corrective action where necessary and to account for Department expenditures. Arguments expressed regarding § 1001 apply here as well.

## II. COMPOSITION OF THE JURY

Defendants also questioned the process of selection of the jury and the alleged bias of one juror in particular. Counsel for defendant Canel filed two affidavits describing the behavior of Juror No. 8, Palmira Benjamin, while in the jury box, as demonstrating a clear bias against the defendants. The affidavit attributes that behavior of bias against government officials to her alleged distrust in officials stemming from her alleged belief that there was an official "cover-up" regarding her son's recent death.

Counsel for defendant Figueroa makes a broader attack. She alleges that the composition of the jury deprived the defendant of his Sixth Amendment constitutional right "to an impartial jury drawn from a fair cross section of the community." This deprivation came about, she claims, because the prosecutor exercised his peremptory challenges to exclude from the jury all persons of Puerto Rican descent. This insured, she alleges, "that the Puerto Rican defendants in the case would not find among those deciding their fate any persons who identified with them, were sympathetic to them, or who generally considered their presence anything but that of a stranger." Counsel suggests that the prosecutor should not, in the jury selection process, be allowed to frustrate a defendant's right to a representative jury by the exclusion of one element of the community, in this case, persons of Puerto Rican descent.

A. *Canel's Claim of Bias by Juror Benjamin*

A party attacking the integrity of the jury on the ground of a juror's prejudice must prove prejudice by a preponderance of the evidence. United States v. Riley, 544 F.2d 237, 242 (5th Cir. 1976), cert. denied, 430 U.S. 932 (1977). Defendant Canel's proof consists of

an affidavit from Robert L. Wilson, Chief Investigator for the Federal Public Defender's Office. He sat at counsel table for the entire trial and observed juror Benjamin "suck her teeth constantly"[3] whenever the defense counsel were active, and "make facial expressions of disgust or disbelief by rolling her eyes heavenward or frowning intensely." He also noted that she made remarks to fellow jurors, causing the latter to "snicker aloud". Never had Mr. Wilson, in his thirty years of involvement with the criminal justice system, seen such a hostile juror.

The second affidavit suggests why juror Benjamin was hostile. It was offered by David H. Jackson, another investigator for the Federal Public Defender, who is a neighbor and friend of juror Benjamin. He explained that Ms. Benjamin lost a son under unexplained circumstances while stationed with the U.S. Navy aboard an aircraft carrier. He said it was "widely circulated" in the Virgin Islands that there was an official "cover-up" of the circumstances surrounding her son's death.

■ The Court does not consider the two affidavits, taken together, as proof by a preponderance of the evidence that juror Benjamin entered the jury box prejudiced and predisposed against the defendants. The Court observed the behavior of all the jurors. Ms. Benjamin was alert and sometimes animated, not only when defense counsel was active. The prosecutor was subjected to various looks also which the defense mistakenly thought were directed only to the defendants. Various witnesses received the same treatment, which included prosecution witnesses as well. That she may have been more demonstrative during Canel's testimony was natural, since this was the highlight of the trial. Canel himself shouted, pointed, accused, defended, explained, argued, and gesticulated during both direct and cross-examination. The entire courtroom was alert and alive. All present knew that Canel's hopes for acquittal rested largely on how he presented himself during his own testimony.

The notion that the death of her son, and a "cover-up" by federal officials of the circumstances of that death, might have played an important role in creating bias against Canel is out of the question. If Ms. Benjamin had a bias because of a federal "cover-up", it would more likely be directed at the federal prosecutor than at one who was accused by federal authorities. Moreover, since she was a friend

---

[3] This is a local custom which indicates feelings of disgust, anger, disbelief, or irritation.

and neighbor of investigator Jackson, who was frequently in the courtroom, an equally valid suggestion could be made of bias in favor of the defendants for whom that friend worked.

Mere hypothesizing or just plain guessing is not "preponderance of the evidence". Defendant Canel has not met the burden of proof for reversal or acquittal on the above cited grounds.

## B. *Jury Composition and Defendant Figueroa's Rights*

The jury ultimately selected to hear the defendants' case consisted entirely of Black persons, ten women and two men, with four alternates, also Black. The prosecutor, with six peremptory challenges, exercised a sufficient number which resulted in the removal of all apparent Puerto Ricans from the jury. The defendants, with twelve peremptory challenges, used a sufficient number which resulted in the elimination of all apparent White persons. Thus, the combined actions of the prosecutor and defense counsel led to the elimination of all Puerto Ricans and White persons, resulting in the all-Black jury which counsel for defendant Figueroa now claims was supposedly "unrepresentative of a fair cross section of the community." What, apparently, counsel really hoped for was not a "fair cross section of the community", but in reality a jury that *included* Puerto Ricans but *excluded* White persons.

Swain v. Alabama, 380 U.S. 202 (1964), is the dispositive case in this matter. It held that a defendant in a criminal case is not constitutionally entitled to a proportionate number of his race on the trial jury or the jury panels, and that the prosecutor's striking of persons of one race from the jury panel in one particular case, under the peremptory challenge system, does not constitute denial of equal protection of the laws. To establish there is improper striking of jurors of one race, a defendant must show that the prosecutor's systematic use of peremptory challenges against persons of one race extended over a period of time. Swain, supra, 380 U.S. at 227.

Case development since then has refined that view. Of particular significance is United States v. Newman, 549 F.2d 240 (2d Cir. 1977), where the circuit court reversed the actions of the U.S. District Court judge who ordered an inquiry into why the prosecutor exercised certain peremptory challenges against Blacks. The Second Circuit responded:

> As the trial court noted, "the prosecutors honestly believed that the striking of Black veniremen would lessen the risk of bias in favor of the defendant and thereby increase the likelihood of a

bias free jury." A prosecutor's opinion that particular venire-men are likely to base their conclusions as jurors on emotional factors such as fear, hate, or sympathy or pity rather than upon the evidence in the case, in the light of the Court's instructions of law, as it is their duty to do, is not an act of invidious racial discrimination.

Newman, supra, 549 F.2d at 249.

Figueroa makes no claim that over a period of time the prosecutors in the Virgin Islands have systematically excluded Puerto Rican veniremen where a Puerto Rican defendant is on trial. Neither the majority nor the dissenters in Swain, supra, permitted an inquiry into the use of the peremptory challenge where such a systematic exclusion was not in practice.

■■■■ The mere act of a prosecutor in exercising his peremptory challenges to exclude persons of the same race as defendants does not in and of itself leave that exercise open to inquiry. United States v. Greene, 626 F.2d 75, 76 (8th Cir.), cert. denied, 449 U.S. 876 (1980), citing to Swain, supra.

Inherent in defendant Figueroa's claim is the suggestion that simply because all members of the jury were Black, and the defendants were Puerto Ricans, the defendants could not, and did not receive a fair trial. To respond to that, this Court adopts the precise language of the Second Circuit in Newman, supra, 549 F.2d at 250, n.8:

> Blacks are the major victims of wrongdoers and it is unlikely that they hesitate to convict where the case warrants it. All of the members of this court, hearing the present case, have served more than a decade as judges of the United States District Court for the District of Connecticut. It has been our experience that Black persons, summoned and drawn for jury panels in that court, have been excellent jurors and have shown no predilection to favor or harm any group, class or kind of persons but have judged the facts on the evidence presented in court in the light of the court's charge.

This has been the experience of this Court both as an advocate and as a judge, in this jurisdiction. This Court also joins with the Second Circuit in the warning of the dangers of forcing inquiry into the reasons behind the exercise of peremptory challenges:

> The right to peremptory challenges is of great importance, both to the Government and to the defendants—but mostly to the

defendants, because they are personally involved in the result of the trial and for this reason usually have more of the peremptory challenges than the Government. These challenges provide one of the most effective assurances that a party will have a fair and impartial jury. If, for example, a defendant knows or has a strong suspicion that a particular venireman is hostile to him or believes the venireman has strong or militant views which would make it unlikely, in spite of the court's instructions, that the venireman would give fair and impartial consideration to the case, and yet the defendant does not have available sufficient evidence to prove these disqualifications on a challenge for cause, he can solve the problem with a peremptory challenge. The same considerations apply to a plaintiff or a prosecutor. Once, however, a plaintiff or prosecutor is required to submit to interrogation concerning his reasons for making a peremptory challenge, it will probably not be long before defendants will be required to do likewise. This, in all likelihood, would spell the end of peremptory challenges; and Blacks and other recognizable minority groups would thereby suffer a major loss in the removal of one of the greatest safeguards the law has provided for a fair trial.

Newman, supra, 549 F.2d at 250, n.8. Counsel's citation to People v. Payne, 50 U.S.L.W. 2748, an intermediate Illinois state court opinion, cannot outweigh the cases cited herein. Counsel urges that the rule that no reason need be given for a peremptory challenge must give way to a constitutional imperative. That stance is rejected here by this Court for the reasons cited above.

 Counsel has shown nothing beyond the prosecutor's exercise of his peremptory challenges which would give rise to any suggestion that defendant Figueroa was deprived of his constitutional rights. The jury, which heard this case sifted through extensive evidence, demonstrated the care it gave to each defendant's case, by finding defendant Figueroa guilty on certain counts, and acquitting him on others. Defendant Figueroa's argument cannot stand.

## III. JURISDICTION: TERRITORIAL COURT JURISDICTION OVER ARTICLE III SUBJECT MATTER

Counsel for defendant Figueroa, joined in by counsel for defendant Canel, has submitted a supplemental memorandum arguing a novel issue as to whether this Court has jurisdiction to preside over this case where only federal crimes are charged. Counsel argues

that applying the rationale of Northern Pipeline Construction Co. v. Marathon Pipe Line Co. et al., 102 S.Ct. 2858, 458 U.S. 50 (1982), this Court as an Article I court does not have jurisdiction to hear cases which are generally heard in Article III courts. More specifically, counsel argues that this Court, because it serves a limited term, subject to political appointment every eight years, deprives her client of his due process right to have his case heard before an Article III court.

██ Northern Pipeline held that the federal statute expanding the powers of bankruptcy judges was in violation of Article III of the Constitution. The plurality opinion was written by Justice Brennan, and was joined by three other justices. We are of the opinion, however, that American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 242 (1828) is controlling. That case involved a question of whether a Florida territorial court had jurisdiction over an admiralty matter which was generally within the exclusive jurisdiction of Article III courts. Similar objections were raised regarding a territorial judge's limited tenureship. The Court held that although admiralty jurisdiction is exclusive in Article III courts in states, the same limitation did not extend to territories. 26 U.S. (1 Pet.) at 257. See also Palmore v. United States, 411 U.S. 389, 403 (1972) (American Insurance Co. is still viable law); Government of the Canal Zone v. Scott, 502 F.2d 566 (5th Cir. 1974). This Court, therefore, has jurisdiction to preside over this case involving the federal criminal statutes of which the defendants have been convicted despite the fact that we are not an Article III court.

## CONCLUSION

The defendants have raised several other issues in their respective motions. They do not, however, have merit and will not be discussed. None of the issues discussed in this opinion warrant a judgment of acquittal or a new trial.[4] The issue of whether the crimes alleged actually come under the heading of "federal crimes" is difficult and validly asserted by the defendants. But the Court is convinced that under the unique relationship of the Department of the Interior to

---

[4] The issue raised by counsel as to the status of the District Court of the Virgin Islands in performance of functions identical to Article III judges is novel. In many ways the Court might ardently hope it is successfully pursued, for this could lead to lifetime status for the judges of this Court. Precedent, however, suggests otherwise. In Northern Pipeline, supra, at 4896, the Supreme Court discusses territorial courts, and recognizes congressional authority to grant them jurisdiction over matters usually reserved only to Article III courts.

the U.S. Virgin Islands embodied in § 17 of the Revised Organic Act of 1954, the appropriate counts of the information do constitute federal crimes under 18 U.S.C. §§ 1001, 2, and 371.

Accordingly, the motions will be denied